# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 06-932

JEROME FREELAND

VERSUS

ERNEST BOURGEOIS, ET AL.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 02-4793
HONORABLE R. RICHARD BRYANT, JR., DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Billy Howard Ezell, Judges.

REVERSED AND RENDERED.

James Clarence Lopez
Guglielmo, Lopez & Tuttle
P. O. Drawer 1329
Opelousas, LA 70571
Telephone:  (337) 948-8201
COUNSEL FOR:
    Defendant/Appellee - Bridgefield Casualty Ins. Co.

Arthur J. O'Keefe
203 West Clarence Street
Lake Charles, LA 70601
Telephone:  (337) 439-6930
COUNSEL FOR:
    Plaintiff/Appellant - Jerome Freeland

**Kenneth Michael Wright**
**203 West Clarence Street**
**Lake Charles, LA 70601**
**Telephone: (337) 439-6930**
**COUNSEL FOR:**
       **Plaintiff/Appellant - Jerome Freeland**

**Charles V. Musso, Jr.**
**Plauche, Smith & Nieset**
**P. O. Box 1705**
**Lake Charles, LA 70602**
**Telephone: (337) 436-0522**
**COUNSEL FOR:**
       **Defendants/Appellees - Coregis Insurance Company, Calcasieu**
       **Parish School Board, and Ernest Bourgeois**

**Ike Amos Hobaugh**
**Wright & Moreno**
**203 West Clarence Street**
**Lake Charles, LA 70601-9431**
**Telephone: (337) 439-6930**
**COUNSEL FOR:**
       **Plaintiff/Appellant - Jerome Freeland**

**THIBODEAUX, Chief Judge.**

The plaintiff, Jerome "Jay" Freeland, appeals a judgment rendered pursuant to a jury verdict which failed to award him damages as a result of an intersectional accident for which the defendants, Ernest Bourgeois, his employer, Calcasieu Parish School Board, and its insurer, Coregis Insurance Company, stipulated liability.

Finding juror confusion and manifest error in evaluating the evidence, we reverse the judgment rendered in favor of the defendants. We award general damages in the amount of $50,000.00 and special damages in the amount of $394,832.40.

## I.

## ISSUES

We must decide:

(1)  whether the trial court erred in allowing three witnesses to testify at trial where their individual names were not listed in the pre-trial order until after the pre-trial order deadline; and,

(2)  whether the jury erred in finding that Mr. Freeland suffered no compensable injuries in the auto accident of October 31, 2001 and, if so, what quantum of damages should be awarded.

## II.

## FACTS AND PROCEDURAL HISTORY

At approximately eight o'clock on the morning of October 31, 2001, forty-three-year-old Jerome "Jay" Freeland, chief radio engineer for Progressive Communications at APEX Broadcasting, was driving to work in his company's Chevrolet van. After stopping at a four-way stop at the intersection of Shady Lane and Guillory Street in Westlake, Louisiana, he proceeded through the intersection and

was struck by Mr. Bourgeois, who was driving a Ford truck owned by his employer, Calcasieu Parish School Board. Mr. Bourgeois admitted that he ran the stop sign in his lane of travel. He told Mr. Freeland that he was traveling at 45 miles per hour when the collision occurred but reported to the officer on the scene that he was only traveling 25 miles per hour, which was the posted speed limit at that location.

The School Board truck struck the van on the passenger door and knocked the van across the intersection, where both vehicles came to rest near the stop sign opposite the one for which Mr. Freeland had stopped. Both vehicles were totaled as a result of the accident. Even though Mr. Freeland was belted, the impact of the collision threw his head and body into the driver-side door and window on his left side, and then ricocheted him back to the right. Broken glass struck Mr. Freeland about the head, face and hands. Mr. Freeland sustained an additional cut on the bridge of his nose from his glasses as they were knocked off of his face. An emergency team arrived at the scene and, noting blood and abrasion on the back of Mr. Freeland's head, removed the pieces of glass and attended to the cuts on his head, face, and hands. Mr. Freeland said that he was shaken up but did not go in the ambulance to the hospital. His employer came to the scene and drove him to the workplace, which was about a block away.

On the day of the accident, Mr. Freeland did paper work on the accident, and was driven to a meeting in Jennings where he repaired a loose speaker wire. He was taken home early and told to rest up and take aspirin. The following day, Mr. Freeland's supervisor, General Operations Manager Tom Williams, informed Mr. Freeland that it was his last day with APEX Broadcasting. A few weeks later, Mr. Williams was also terminated.

2

Prior to coming to Louisiana, Mr. Freeland was a retired army major and a single father who had had custody of his teenaged son since the boy was around two years old. He had been a chief radio engineer working with Tom Williams in Anniston, Alabama for six years. Mr. Williams accepted a position in Louisiana with APEX Broadcasting and recruited Mr. Freeland to work for him here in April of 2001. They anticipated eighteen to twenty-four months of work in Louisiana upgrading and building new facilities here and then a lucrative move with the company to South Carolina. Upon termination, because APEX had supplied Mr. Freeland's vehicle and hotel lodging in Louisiana, as well as his cell phone, Mr. Freeland was without resources in the area. He accepted the invitation of Tom Williams to stay at his house.

Due to the APEX construction project and scheduling requests, Mr. Freeland had already scheduled vacation time to begin on November 3, 2001. He flew to his sister's house in Largo, Florida. He had begun to suspect a sprain or pulled muscles due to increasing neck, back, and shoulder pain and had been self treating with Ibuprofen, wraps and topical analgesics. He also had headaches, blurred vision, vertigo, and numbness and tingling in his arms and hands. Mr. Freeland's sister suggested that he and his son move in with her. He began looking for work and unsuccessfully called various radio stations and engineers that he knew. He was advised to wait until he was clear of his injuries. He returned to Anniston, Alabama, where he had a home and rental properties.

On November 27, 2001, Mr. Freeland went to his chiropractor in Anniston, Dr. David Wade, for treatment due to increasing pain from the accident. Dr. Wade performed cervical x-rays and found a reversal of the lordotic curve, stair-stepping in the lateral curve indicating ligament damage, and compression of the

3

Luschka joint at C6. Mr. Freeland also had bilateral elbow pain and numbness in his hands. Dr. Wade diagnosed cervical and thoracic strain and sprain, cervical subluxation, vertigo and blurred vision, and related Mr. Freeland's problems in November 2001 to the auto accident on October 31, 2001. Dr. Wade treated Mr. Freeland for two weeks and suggested that he see a neurologist.

Mr. Freeland lost his properties in Anniston, Alabama to foreclosure, and he and his son moved to Largo, Florida to live with his sister and brother-in-law, both of whom worked for the Pinellas County Sheriff's Department. He inquired regarding a neurologist in Florida and was referred to Dr. Robert Vollbracht, a board certified neurologist practicing in Clearwater, Florida.

On January 11, 2002, Dr. Vollbracht saw Mr. Freeland for the first time and found limitation of neck motion; tautness of paraspinal muscles in the base of the skull; trigger points; tenderness along the trapezius muscle and interscapular area; tenderness over both occipital nerves at the base of the skull; decreased sensation on the left hand; weakness in the intrinsic hand muscles; decrease in triceps reflex on the left side. Dr. Vollbracht's impressions were cervical strain, thoracic strain, post traumatic headaches with elements of occipital neuralgia, left hand numbness, ulnar neuropathy, and post traumatic positional vertigo, all of which he attributed to the 2001 auto accident.

Dr. Vollbracht ordered an MRI scan of the cervical spine which showed cervical disk protrusion/herniation at the C6-7 level with impingement on the thecal sack. Because of the hand numbness, he also ordered nerve conduction studies which indicated a bilateral ulnar neuropathy. Dr. Vollbracht treated Mr. Freeland conservatively for the first year with anti-inflammatory and pain medication, muscle relaxers, physical therapy, and exercise. He then began special pain treatments in the

4

form of injections, which are ongoing. Dr. Vollbracht assessed Mr. Freeland with an eleven percent (11%) total body permanent impairment due to the accident in 2001.

During his earlier treatment with Dr. Vollbracht in 2002, Mr. Freeland received lost wage benefits from Louisiana for about five months. Dr. Vollbracht restricted him to light duty and told him not to do anything strenuous, with no heavy lifting and no climbing. Mr. Freeland continued to look for a light duty position in Florida. Mr. Freeland had learned of a position that appeared to fit the criteria of light duty as it pertained to physical work, and he applied for the position of Child Protection Investigator (CPI) with the Pinellas County Sheriff's Department. A physical examination was required.

On July 24, 2002, Dr. Edward Kasper, an occupational medicine physician in Largo, Florida, on behalf of the Pinellas County Sheriff's Department, conducted a ten-minute hands-on examination of Mr. Freeland and found him fit for the CPI position. Dr. Kasper also took into consideration the results of tests performed by his staff, which included a normal EKG, chest x-ray, a 17.1 percent body fat assessment, and a successful back screen. Mr. Freeland was also required to fill out a medical history questionnaire. Therein, he admitted to having an auto accident on October 31, 2001; he listed all of the injuries associated with the accident; and, he admitted to having received workers' compensation benefits for those injuries. However, fearing that he would not get the much-needed job, Mr. Freeland did not admit to any ongoing physical problems.

At trial, Mr. Freeland admitted that he had lied by omission on the questionnaire by not putting a check mark in the column for present problems. He stated that he did not believe in lying, but he had a son to support, was between a rock and a hard place, and had to find work. However, Mr. Freeland testified that after he

was hired, he did not misrepresent his physical condition when signing up for his insurance benefits. Therefore, his neck and back injuries were excluded from coverage, and he could not purchase short term disability insurance. Likewise, he admitted to the neck, back, hands, and arm injuries with regard to workers' compensation insurance, and his new employer's workers' compensation carrier has an exclusion for those conditions.

In August 2002, Mr. Freeland was hired for the position of Child Protection Investigator with the Sheriff's Department, and he began a training program. This was his first job since the accident, and it paid significantly less than his pre-accident employment. The position required conducting interviews, often at night, taking chronological notes, writing reports, inputting computer data, reading court documents and prior investigative reports. Mr. Freeland had headaches, problems with concentration, and numbness in his hands. He testified that six to eight hours into the work-day his difficulties increased in severity, and he was working eleven to twelve hours a day. His work product suffered. He was not getting his investigations and data input done in the time required and without errors, and there were problems with his handwriting and the legibility of his chronological notes.

Eventually, Mr. Freeland was told that he was good with children and was asked to step down to the position of Family Support Worker as of March 2003. He testified that of the four other people who were in the CPI training program with him, he was the only one who did not make investigator, even though he had scored higher than most of the others on the entry exam. Mr. Freeland's new duties as a family support worker included coordinating family visits, transporting children to doctors' appointments, assisting the investigators in various ways, and filling out a

one-page form by putting checkmarks in the appropriate boxes, with next to no computer input, and very little overtime. Mr. Freeland was able to perform the duties in this support position, which paid approximately $8,000.00 less annually than the CPI position.

Subsequently, Mr. Freeland learned of another light duty position with the Sheriff's Department with a starting pay similar to the CPI position. He obtained that position as a corrections officer, or detention deputy (jail guard), by going to the academy for four months and passing the state exam. By the time he got out of the academy, he was earning more than the CPI position had paid, but still less than his pre-accident earnings as a radio engineer. Mr. Freeland testified that the deputy job is less rewarding, but he is glad to be working. He basically counts dining trays and logs 72 misdemeanor detainees in and out of their cells. Mr. Freeland was still employed in that capacity at the time of trial.

In February 2006, the defendants admitted to liability for the accident via their response to Mr. Freeland's Motion for Summary Judgment on that issue. Judgment was rendered accordingly. The case proceeded to trial on the issue of damages only in March 2006. At the beginning of trial, Bridgefield Casualty Insurance Company, the workers' compensation intervenor, appeared, and the parties stipulated to the $10,746.00 in lost wage benefits received by Mr. Freeland from November of 2001 to May of 2002, and also stipulated to the $19,586.50 in medical benefits paid as of February 24, 2006.

The court also heard Mr. Freeland's Motion In Limine to exclude the testimony of three representatives of APEX Broadcasting whose names were not listed timely pursuant to the court's Pre-Trial Order. The motion was denied, and the three witnesses were allowed to testify at trial. The jury heard testimony for four

days, during which time six depositions were read or shown to the jury in lieu of live testimony. All medical testimony was by deposition.

The jury received jury charges and instructions on the fifth day and began deliberations. They were given a verdict form with two questions. The first question asked, "Did Jerome Freeland sustain injuries as a result of the accident on October 31, 2001?" If the first question was answered in the affirmative, the jury was to proceed to the second question which asked the jury to quantify each element of damages sought by Mr. Freeland and to determine a total award for a judgment in his favor. During deliberations, the jury sent a note to the trial judge asking the following: "We would like to know if question #1 on the verdict form means **any** injury or just current complaints and conditions." They received the following response: "Your question is unclear. You simply must answer question number 1 based on the testimony at trial & my instructions to you." The jury then returned a verdict in favor of the defendants by answering question number one on the verdict form in the negative. Mr. Freeland has appealed the trial judge's denial of his Motion in Limine, and the jury's verdict finding no compensable injuries and awarding no damages.

III.

## LAW AND DISCUSSION

### Standard of Review

An appellate court may not set aside a trial court's findings of fact in absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A two tiered test must be applied in order to reverse the findings of the trial court: (a) the appellate court must find from the record that a reasonable factual basis does not exist

8

for the finding of the trial court; and (b) the appellate court must further determine that the record establishes that the finding is clearly wrong. *Mart v. Hill*, 505 So.2d 1120 (La.1987). Rather than simply review the record for some evidence which supports or controverts the trial court's finding, the reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Even if the appellate court feels that its own evaluations are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *Rosell,* 549 So.2d 840; *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978).

> *However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45.* (Emphasis supplied).
>
> Balanced against these directives is the idea that: "[t]he principles of appellate review do not require an appellate court to affirm the trier of fact's refusal to accept as credible uncontradicted testimony or greatly preponderant objectively-corroborated testimony where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles. *Mart v. Hill*, 505 So.2d 1120 (La.1987)."

*Butler v. Zapata Haynie Corp.,* 92-71 (La.App. 3 Cir. 2/23/94), 633 So.2d 1274, 1279, *writ granted in part, judgment amended,* 94-1171 (La. 7/5/94), 639 So.2d 1186 (reduced loss of earnings award to $150,000.00), *cert denied, Zapata Protein (USA), Inc. v. Butler*, 94-616 (U.S. La. 11/28/94), 513 U.S. 1017, 115 S.Ct. 579.

## Motion in Limine

Prior to trial, Mr. Freeland sought to exclude the testimony of three witnesses whose names were not timely submitted on the defendants' witness list pursuant to the pre-trial order. The trial court denied Mr. Freeland's motion in limine on the morning of trial. The trial proceeded immediately afterward, and the witnesses were subsequently allowed to testify before the jury. Mr. Freeland asserts that the trial court erred in denying the motion and asks this court to strike the testimony of the three witness.

In addressing this evidentiary issue, we consider the following pertinent facts. The trial was set for March 13, 2006. On October 25, 2005, the trial court issued its Pre-Trial Order instructing the parties to submit their non-expert witness list six weeks before trial, which was January 30, 2006. The Pre-Trial Order also called for the inclusion of the witnesses' addresses and a description of the subject matter about which they would testify at trial. Mr. Freeland submitted his witness list with names, addresses, and subject matter, as ordered, on January 30, 2006.

Ernest Bourgeois and the Calcasieu School Board did not submit a witness list on January 30, 2006. On February 7, 2006, the defendants did file a witness list, naming for the first time three APEX Broadcasting representatives, Gary Shannon, Dave Chimeno, and Brian Taylor. The list did not include the addresses of the witnesses or the subject matter about which they would testify at trial. In opposition to Mr. Freeland's motion to exclude the testimony, the defendants argue that they had submitted two previous witness lists, on September 14, 2005 and on October 11, 2005, listing generally a "representative of APEX Broadcasting Company." They further submit that they informed Mr. Freeland's counsel on February 9, 2006, two days after filing the names of the representatives, that these

APEX representatives would serve as impeachment witnesses. Defendants argue that impeachment witnesses do not have to be named in a pre-trial witness list.

The applicable law on this issue is found in our Code of Civil Procedure and provides as follows:

> La.Code Civ.P. art 1551. Pretrial and scheduling conference; order
>
>  A.  In any civil action in a district court the court may in its discretion direct the attorneys for the parties to appear before it for conferences to consider any of the following:
>
> . . . .
>
> (7) The identification of witnesses, documents, and exhibits.
>
> . . . .
>
> B.  The court shall render an order which recites the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreements of counsel.  Such order controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice.
>
> C.  If a party's attorney fails to obey a pretrial order, or to appear at the pretrial and scheduling conference, or is substantially unprepared to participate in the conference or fails to participate in good faith, the court, on its own motion or on the motion of a party, after hearing, may make such orders as are just, including orders provided in Article 1471 (2), (3), and (4).  In lieu of or in addition to any other sanction, the court may require the party or the attorney representing the party or both to pay the reasonable expenses incurred by noncompliance with this Paragraph, including attorney fees.

In *Waste Management Of Louisiana, LLC v. Tadlock Pipe & Equipment, Inc.*, 04-1151 (La.App. 3 Cir. 12/8/04), 889 So.2d 457, *writ denied,* 05-0014 (La. 3/18/05), 896 So.2d 1005, we articulated the policy considerations regarding the trial court's pre-trial order as follows:

La. C.C.P. art. 1551 gives a court wide discretion to provide for implementation of a pretrial order and to insure that the items of the pretrial order are enforced. The theory inherent in pretrial procedure is the avoidance of surprise and the allowance of the orderly disposition of the case. The pretrial order controls the subsequent course of action, though it can be modified at trial to prevent substantial injustice. The trier of fact is given broad discretion to determine whether to modify a pretrial order. This discretion is controlled by the principle that it must be exercised to prevent substantial injustice to the parties who have relied on the pretrial rulings or agreements and structured the preparation and presentation of their cases accordingly. Absent an abuse of discretion, the trier of fact's decision will be upheld.

*Waste Management Of Louisiana, LLC*, 889 So.2d at 460 (citations omitted).

In the *Waste Management* case, the plaintiff sought to call a witness at trial whose name had not been included on the pre-trial witness list. The trial court refused to allow the testimony. As in the current litigation, the argument was that the witness should have been allowed to testify because he was being called as an impeachment witness. However, upon analysis, a panel of this court determined that the witness was not an impeachment witness and upheld the trial court's exclusion of the testimony, stating as follows:

In its argument to the trial court, Waste Management called Arabie both as an impeachment and a rebuttal witness. In its appellate brief, it argues that Arabie is an impeachment witness, whose testimony was offered to refute that given by David Tadlock. No matter the type of witness, we find that the trial court did not abuse its discretion in refusing his testimony. The proffered testimony clearly goes to the main issue of whether Tadlock Pipe was disposing of contaminated waste, whether it knew that it was disposing of such waste, and the actions it took to avoid being discovered as the source of the waste at issue. Thus, we conclude that Waste Management clearly intended Arabie's testimony as direct evidence of the issue being litigated, rather than the impeachment evidence it claims. Accordingly, we find that his name should have been included on the pre-trial witness list and that the trial court did not err in refusing to allow him to testify at trial.

*Id.* at 460.

We reached a similar decision in *Offord v. Holloway Const. Co.*, 567 So.2d 690 (La.App. 3 Cir. 1990), in affirming the trial court's exclusion of undisclosed investigative testimony and video surveillance tapes of the plaintiff proffered by the defendant. There, we held that the tapes were direct evidence of the plaintiff's condition purporting to contradict the evidence offered by the plaintiff regarding his condition. However, since the plaintiff was never asked about the activities in the tapes, the tapes could not be used to impeach him.

In the present case, Mr. Freeland testified at the very beginning of trial regarding his military background in communications, his overseas projects and commendation medals, his active and reserve officer status, his various degrees and licenses, the accident itself, his injuries and treatment, previous accidents and treatment, and his pre-accident and post accident salaries and daily living activities. He also testified regarding his pre-accident job requirements as a radio engineer, the job requirements in the post-accident positions in Florida, and he admitted to having lied by omission on the medical questionnaire in order to get the Florida job in 2002.

In discussing his pre-accident employment as a chief radio engineer in the small markets of Anniston and Lake Charles, Mr. Freeland compared his work with the work of a chief engineer in the large markets such as Atlanta and New York. In the larger market there is an engineer for each station, and the chief engineer will have four or five engineers and a couple of technicians working for him in setting up remotes and computers and in performing the numerous tasks involved in keeping a radio station on the air.

In the small markets, however, the chief engineer is often the only engineer, and he does a little of everything. Mr. Freeland discussed setting up the

studios, the transmitters, maintaining the broadcasting equipment, the air conditioners, the generators at the remote sites, often lifting heavy or cumbersome equipment, and climbing up in towers to replace cabling or to realign satellite dishes after a windstorm or heavy rain. He described putting in control panels and getting assistance putting in a panel board weighing 150 pounds, dismantling transmitters, replacing heavy tubes, rewiring and replacing commercial CD players, working in narrow places and in awkward positions, crawling, reaching, and pulling wire. Mr. Freeland also stated that if there is a tower problem really high up, a tower crew is brought in for that.

Mr. Freeland's testimony was supported by the testimony of Tom Williams, General Operations Manager and Vice President of APEX Broadcasting in 2001. Mr. Williams stated that Mr. Freeland had to climb towers and that he was with him when he had to change big tubes by reaching in and literally wrapping his arms around the tube, bending over, and lifting it out. Mr. Williams stated that he tried it once, and after grunting and groaning for a while, he gave the task back to Mr. Freeland. Mr. Williams also stated that Mr. Freeland had to move incredibly heavy nitrogen bottles, and swap out heavy tubes on a regular basis, so as not to burn up a $10,000.00 dollar tube. We note from the various medical records that Mr. Freeland was five feet seven, or seven and a half, inches tall and weighed one hundred forty-five to one hundred fifty pounds. Mr. Williams described him as a "whirling dervish" and stated that Mr. Freeland's nickname in Alabama had been "the flying squirrel."

Mr. Williams described Mr. Freeland before the accident as hardworking, loyal, tenacious, and very effective in getting the job done. He described a particular incident wherein Mr. Freeland was called out after a lightning strike in the middle of the night and worked on a transmitter for six hours, getting the

14

station back on the air before Mr. Williams knew it was down. Mr. Williams further stated that just getting to a tower could be difficult, since the towers are often placed in remote locations. He described an incident in Alabama when he had driven Mr. Freeland out to a tower in a mountainous location in a rain storm, almost driving the four-wheel drive vehicle on its side through the rutted roadways. He described the engineer's job as strenuous in a small market and said one had to climb, bend, stoop, crawl, and yank to get at the wires, and basically had to be half squirrel.

Near the end of the trial, the defendants began calling the three "impeachment" witnesses to provide live testimony. The first was David Chimeno, the chief engineer at APEX since May of 2002. Therefore, he was hired six months after Mr. Freeland was terminated. He testified that the chief engineer's main job is to maintain the broadcast equipment, computers and amplifiers. He provided conflicting testimony, stating that the heaviest radio equipment was twenty-five to thirty pounds. However, at the same time he stated that when an engineer has to change a plate transformer in a transmitter weighing 800 pounds, the engineer gets help to do that. Mr. Chimeno further testified that engineers do not climb towers, but that tower crews perform that duty. He described the work as no more physically demanding than mowing a yard.

While this testimony conflicts with Mr. Freeland's testimony in some cases and agrees in others, it is not impeachment testimony. Mr. Chimeno did not work with Mr. Freeland at APEX in Lake Charles/Westlake/Jennings, or in Anniston or Atlanta. He cannot impeach Mr. Freeland's testimony regarding what Mr. Freeland did as a chief engineer because he was not there. On cross-examination, Mr. Chimeno admitted that the APEX facility no longer functions as it did when Mr. Freeland and Mr. Williams were on board, in that it is now used as a transmitter site

15

and storage facility. Clearly, the character of the APEX operations were in flux and transition in 2001 and thereafter. Mr. Chimeno's experiences in 2002 are different from Mr. Freeland's, but his testimony does not serve to impeach Mr. Freeland's testimony.

The next "impeachment" witness called by the defense was Gary Shannon. He had been a program director at one of the local radio stations owned by APEX since around 2002. However, he had been employed at other APEX stations in some capacity since the late 1990's. Therefore he knew Mr. Freeland. Even though he was not an engineer, Mr. Shannon testified that an engineer's work was not physically demanding and did not require climbing. He testified that Mr. Freeland did not do the tasks on his list of needs, and could not even fix the light on the telephone. Even though Mr. Freeland only worked a day and a half after the accident, and was in Jennings on both days, Mr. Shannon stated that he did not see signs of injury in Mr. Freeland after his accident.

On cross-examination, Mr. Shannon admitted that Tom Williams was the General Manager, the person in charge of the whole operation and to whom everyone answered. With regard to his "list" of tasks, Mr. Shannon admitted that if Mr. Freeland was responding to a greater authority than himself, such as Mr. Williams, he could not speak to that. When shown exhibits depicting various components of radio broadcasting equipment, including a control board weighing 158 pounds, an audio board weighing 46 pounds, an "Omnia" weighing 32 pounds, a digital user interface weighing 100 pounds, a tube weighing 45 pounds, he replied, "I really am just an on-air person. I have - - know nothing about the technical end of radio when it comes to fixing things. . . ."

Again, this live testimony at the end of trial was not impeachment testimony. Mr. Freeland never said that he moped or limped around at work the day and a half he was there after the accident. In fact, there had been much earlier testimony regarding Mr. Freeland's military training, posture, demeanor, and stoic nature, even when working in pain, by people who spent time with him on a regular basis. One witness who worked with Mr. Freeland on a daily basis in Florida after the accident testified that she knew that Mr. Freeland was in pain at work, not because he complained or looked tired, but because he became even more rigid in his posture. Again, the testimony of Gary Shannon did not impeach the testimony of Mr. Freeland because Gary Shannon was not an engineer who worked alongside Mr. Freeland and because Mr. Freeland did not complain about his injury in the workplace.

The last witness to testify at trial was Brian Taylor, the current Operations Manager at APEX Broadcasting. He had supervised Mr. Freeland for two or three months in 2001. He testified that engineers did not have to lift over 15-20 pounds on a regular basis. He stated that in his career in radio he had seen a "good bit" of what chief engineers do, but that he "mostly kind of put together a list" of repair needs and things to "make our job easier." Brian Taylor testified that he was having trouble getting the things on his list done and, therefore, had something to do with Mr. Freeland's termination.

However, on cross-examination, Taylor admitted that Mr. Freeland regularly had to go out to transmitter units to change out, replace, or rotate the big 4CM 400 tubes and other tubes. Taylor admitted that he had never changed a tube himself but had "assisted" other engineers by watching at late hours to make sure that no one got injured. He further admitted that the engineer he watched had to use both

17

hands and pull and yank in order to lift and remove the tube. Taylor admitted to having no training or licensing, himself, as a radio engineer. Taylor further stated that he and Mr. Freeland both answered to Tom Williams. After Mr. Freeland and Tom Williams left APEX Broadcasting, and Mr. Freeland applied for the first job in Florida, Taylor admitted to providing a written job recommendation report on Mr. Freeland to the Pinellas County Sheriff's Department. Therein, he reported that Mr. Freeland was dependable and honest. He further answered the question regarding reasons why this person would not be a suitable employee as "none."

Earlier in the trial, the jury had been read the deposition testimony of the head man at APEX, Tom Williams, regarding the "divided-house" work dynamic that existed at APEX in 2001. Mr. Williams explained that, as General Operations Manager and Vice President, he worked on a daily basis with the son of the owner of the broadcasting company. He testified that the son and the father promoted different issues, and while Mr. Williams was fulfilling the wishes of the son, the father wanted different things done. The father sent in Brian Taylor from the company's Mississippi operation. Mr. Williams said that he did not think there was any "love lost right out of the box."

Mr. Williams testified that Jay Freeland could work with anyone, and could have worked with Taylor, if Taylor had been hired by Mr. Williams, instead of being sent in by the owner. Mr. Williams further stated that Jay Freeland's response at being terminated without reason or explanation was simply, "Well, sir, yes, sir." No questions asked. He stated that with Mr. Freeland's military background, he would have recognized that the work they were doing for the father differed greatly from the work they were doing for the son. Mr. Williams further testified that when he terminated Jay Freeland, pursuant to the decision by the owner, Mr. Williams saw

18

"the handwriting on the wall" and knew that he, himself, would be next. Mr. Williams specifically stated that Mr. Freeland was not fired for cause, and that Mr. Williams himself was not given a reason when instructed to terminate Mr. Freeland. He further testified that Mr. Freeland received severance pay at termination.

Accordingly, while the testimony of Brian Taylor conflicted with the testimony of Mr. Freeland and Mr. Williams regarding whether the position of radio engineer in a small market is light duty, as the defense claims, or medium duty, or heavy duty, it did not impeach prior testimony regarding what Mr. Freeland, himself, had done as a chief radio engineer in his own experience. In fact, Taylor admitted that he had seen engineers pull and yank on heavy equipment and tubes, which was consistent with the testimony of Mr. Freeland and Mr. Williams. In addition to conflicting, but not impeaching, some prior testimony regarding the physical aspects of Mr. Freeland's work, Taylor's testimony implied that Mr. Freeland was terminated for cause, which he was not, and further implied that his failure to return to his prior earning capacity as a radio engineer was due to his engineering ability, rather than his injuries from the accident.

The testimony of Chimeno, Shannon, and Taylor would have been admissible as conflicting evidence of the physical work performed by radio engineers. Their testimony would also have been admissible as direct evidence for the jury to consider in differentiating between the loss of work due to injury and the loss of work due to termination. However, Mr. Freeland testified that he did not know why he was terminated. Therefore, the APEX testimony was not impeachment testimony. Mr. Freeland testified that, at first, he was not given a reason for the termination. Subsequently, he was told that it was budget cuts. At times, he thought it must have had to do with the accident. When the form from APEX came to Florida indicating

"inability" to do the job, Mr. Freeland testified that he thought it was because of the accident, because he had never had trouble doing the job before. Moreover, APEX was paying his medical bills and lost wage compensation due to the accident.

Because the testimony of the three APEX witnesses was direct rather than impeachment testimony, their names and addresses, and the subject matter of their testimony should have been timely submitted on January 30, 2006, so that Mr. Freeland's counsel could depose them and more fully prepare his cross-examination of them at trial. Having said that, however, while we believe that the preferable procedure would have been to disallow the testimony as violative of the trial court's pre-trial order, we cannot say that the trial court committed a gross abuse of discretion warranting a reversal. "The judge's discretion includes the admissibility of a witness's testimony. It is only upon a showing of a gross abuse of discretion that appellate courts have intervened." *Waste Management Of Louisiana, LLC,* 889 So.2d at 460 (citations omitted). Additionally, our courts have held:

> If a party objects to the offered testimony of a witness not listed on the pre-trial order, a trial judge has great discretion in deciding whether to receive or refuse the testimony objected to on the grounds of failure to abide by the rules, but any doubt must be resolved in favor of receiving the information. *Abdon Callais Boat Rentals, Inc. v. Louisiana Power and Light Co.*, 555 So.2d 568, 576 (La.App. 1st Cir. 1989), *writ denied*, 558 So.2d 583 (La.1990); *Curry v. Johnson*, 590 So.2d 1213, 1216 (La.App. 1st Cir. 1991).

*Palace Properties, L.L.C. v. Sizeler Hammond Square Ltd. Partnership*, 01-2812 (La.App. 1 Cir. 12/30/02), 839 So.2d 82, 91, *writ denied,* 03-0306 (La. 4/14/03), 840 So.2d 1219.

In the present case, the trial judge must have had doubts regarding the admissibility of the witnesses whose specific names were added to the defendants' witness list late, in this case, five, rather than six, weeks before trial. As the

defendants argue, the record does contain two previous witness lists, filed months before trial, wherein the defendants list a "representative of APEX Broadcasting." Apparently, the trial judge thought that justice would not be served if a current APEX representative was not allowed to testify. Moreover, counsel for Mr. Freeland indicated that, while he was not able to depose these three witnesses, he was able to speak to them prior to trial. Therefore, there was no egregious element of surprise at the last minute, and we note that counsel for Mr. Freeland did perform an effective cross-examination of these witnesses. Accordingly, we will not reverse the trial court on this procedural issue.

## Injuries

Mr. Freeland argues that the jury was clearly wrong in finding that he was not injured in the auto accident on October 31, 2001, and in failing to award damages for his injuries. We agree. The defendant, Mr. Bourgeois, driving his employer's heavy work-truck, ran a stop sign at 45 miles per hour and broadsided Mr. Freeland's van, knocking the van ten feet in an almost perpendicular direction from the direction in which Mr. Freeland was traveling. Both vehicles were totaled as a result of the accident. Mr. Freeland's head and body were thrown into the driver-side window and door hard enough to knock the glasses off of his face. He sustained cuts to his head, face and hands. An ambulance was called to the scene. The emergency team reported that there was blood and abrasion on the back of Mr. Freeland's head. They removed pieces of glass from his head and face, and tended to cuts on his hands. Mr. Freeland was shaken up but could walk. He began to have headaches and increasing soreness and stiffness in his neck, shoulder and back, and self-treated with Ibuprofen, wraps, and topical analgesics. He also developed blurred vision, dizziness, elbow pain and numbness in his hands.

21

On November 27, 2001, within weeks of the accident, Mr. Freeland went to his former chiropractor in Anniston, Alabama, Dr. David Wade. Dr. Wade examined Mr. Freeland and found tenderness and restricted motion in the neck and mid and low back. He performed cervical x-rays and found a reversal of the cervical or lordotic curve. He found stair-stepping in the lateral curve, indicating ligament damage resulting from the neck's side-to-side lateral flexion and extension when Mr. Freeland's vehicle was impacted from the side. Dr. Wade also found compression of the Luschka joint at the superior border of C6. He explained that the Luschka joint is a little rim of bone that acts as a lateral stabilizer in the cervical spine and that it had been knocked off. Dr. Wade stated that it usually takes some kind of traumatic force to do that. Mr. Freeland also had bilateral elbow pain and numbness in his hands. Dr. Wade diagnosed cervical and thoracic strain and sprain, cervical subluxation, vertigo and blurred vision, and related Mr. Freeland's problems in November 2001 to the auto accident on October 31, 2001.

Dr. Wade treated Mr. Freeland from November 27, 2001 through December 10, 2001 with intersegmental traction, electrical stimulation, manual therapies, ice for swelling, and therapeutic exercises for his balance problems. Dr. Wade learned that Mr. Freeland was going to relocate to Florida and instructed him to consult a neurologist there because of the ongoing dizziness and vertigo.

On January 11, 2002, Mr. Freeland began treating with Dr. Robert Vollbracht, a board-certified neurologist. Upon examination, Dr. Vollbracht found mild to moderate limitation of neck motion on lateral rotation and extension; paraspinal muscles in the base of the skull were taut; trigger points; areas of focal tenderness along the trapezius muscle and interscapular area between the shoulder blades; tenderness over both occipital nerves at the base of the skull; decreased pin-

22

prick to sensation on the left hand at fourth and fifth fingers; component of weakness in the intrinsic hand muscles; question of slight decrease in triceps reflex on the left side. Dr. Vollbracht's impressions were cervical strain, thoracic strain, post traumatic headaches with elements of occipital neuralgia, left hand numbness, ulnar neuropathy, and post traumatic positional vertigo, all of which he attributed to the October 2001 auto accident.

As a result of these objective findings upon examination, Dr. Vollbracht ordered an MRI scan of the cervical spine and ordered nerve conduction studies because of the hand numbness. He also gave Mr. Freeland exercises for the vertigo, stretching exercises for the neck and shoulder, and prescribed anti-inflammatory medication. The MRI results showed cervical disk protrusion/herniation at the C6-7 level with impingement on the thecal sack surrounding the spinal cord. Additionally, the results of the nerve conduction studies were abnormal, showing a slowing of the ulnar nerve as it goes across the elbow, on both elbows, indicating a bilateral ulnar neuropathy. Dr. Vollbracht treated Mr. Freeland conservatively throughout 2002 with anti-inflammatory and pain medication, muscle relaxer medication, physical therapy sessions, and a program of exercise.

However, Mr. Freeland failed to respond to the conservative treatments. Noting the ongoing areas of tightness in his neck, and his abnormal neck posture, Dr. Vollbracht recommended a series of Botox injections, a recognized treatment used to relax muscles and relieve pain. Dr. Vollbracht explained the genesis of Botox, stating that it had come out twenty years ago for various neurological conditions called spacicity. It has been used for the treatment of children with cerebral palsy, stroke victims, and for those like Mr. Freeland, suffering from torticollis, which is an abnormal neck position wherein the head favors one side due to hyperactive muscles.

23

It is also used for a variety of headache problems. Dr. Vollbracht has been very active in the field and has recently been selected as one of one hundred physicians nationwide to train other physicians in the use of Botox for the treatment of pain.

Dr. Vollbracht further explained how the chemical works on the microscopic space between the nerve and the muscle: The nerve has a neurotransmitter called acetylcholine. When the nerve is stimulated, it releases the acetylcholine, which goes over, hits the muscle and makes the muscle contract. The Botox is injected into the muscle. In Mr. Freeland's case, it was injected into various muscles in his neck and back, and it is absorbed by the nerve endings. It basically blocks the receptor protein that is needed to release the acetylcholine, so the nerve cannot release the neurotransmitter, and certain muscles are prevented from contracting. It, therefore, blocks pain impulses and inhibits the pain response. In brief, the process, also called chemo-denervation, blocks the receptors, and the nerve does not fire.

The injections have been successful in decreasing spasm and improving neck posture for Mr. Freeland, and they allow him to function better and to perform the activities of daily living with less pain and less medication. He has experienced improvement in his neck, back, and shoulder, and has had a lessening of his headaches. However, he has pain every day, and states that he starts each day at a pain level of "2" instead of "0." Moreover, the Botox takes seven to fourteen days to take effect, and it wears off after three months because the nerve basically repairs itself. Mr. Freeland began receiving the injections in January of 2003, and it is anticipated that he will continue to need them indefinitely. Once the effect of the Botox starts to wear off, Mr. Freeland goes back to pain medication until the next injection, and has success alternating between the two. At the time of Dr.

Vollbracht's deposition in February 2006, the last documented injection was December 22, 2005.

In spite of the improvements with the Botox treatments, Mr. Freeland still had difficulty driving, climbing, and lifting and had ongoing problems with numbness and tingling in the arm and hands. At one point in his ongoing treatment, Dr. Vollbracht anticipated that Mr. Freeland would need ulnar nerve surgery within five years. However, he has withdrawn that assessment and not included a surgery cost in his estimate of future medical costs. Dr. Vollbracht has assessed Mr. Freeland with an eleven percent (11%) total body permanent impairment due to the accident in 2001, with 4% attributed to the neck, 2% attributed to the thoracic region, 2% to the occipital nerves, and 3% to the ulnar nerves in his hands.

To counter these overwhelming objective findings of injury by Mr. Freeland's treating neurologist, Dr. Vollbracht, and his treating chiropractor, Dr. Wade, the defendants introduced the deposition testimony of Dr. Edward Kasper, the occupational medicine physician who examined Mr. Freeland in connection with his job application with the Pinellas County Sheriff's Department in Florida. Dr. Kasper testified that he had spent about ten minutes with Mr. Freeland, and he found no spasm. Mr. Freeland's EKG results were good, his chest x-ray was normal, body fat was only 17.1 percent, and he qualified according to the back screen administered by Dr. Kasper's staff. Accordingly, Dr. Kasper found Mr. Freeland fit for the investigative position that he sought.

Dr. Kasper did not have Mr. Freeland's cervical x-rays from Dr. Wade or the MRI and conduction studies performed by Dr. Vollbracht. Dr. Kasper spent only ten to fifteen minutes with Mr. Freeland, who has admitted that he desperately needed the job and, therefore, denied ongoing physical problems. At the time of the

July 24, 2002 physical with Dr. Kasper, Mr. Freeland had been under the care of Dr. Vollbracht, a board-certified neurologist, for almost seven months. He was benefitting somewhat from muscle relaxers, pain medication, and physical therapy, and he was completely focused on passing the physical. In fact, Mr. Freeland apparently managed to lift fifty pounds on the day of the physical. However, this by no means indicates that he could lift that kind of weight on a regular basis, nor the toll the exertion may have taken that day.

Mr. Freeland testified that when he overexerted himself while doing household tasks, he suffered setbacks, and he had learned to pace himself. In evaluating the evidence of a ten-minute exam with Dr. Kasper, a non-board-certified occupational medicine physician, whose only job was to qualify Mr. Freeland for employment, and the evidence of Mr. Freeland's neurologist, who had been treating him for seven months, the jury should have given more weight to Dr. Vollbracht's findings.

This is particularly true in light of the testimony regarding Mr. Freeland's stoic nature and his habits in all things related to work. More specifically, Mr. Freeland was not a complainer. Dr. Vollbracht testified that Jay Freeland was a relatively quiet person and that he had to draw things out of him. Jeff Peterson, the occupational rehabilitation specialist, testified that Jay Freeland, like other of his clients with military backgrounds, as well as people working in law enforcement, did not whine and complain, as complaints are not looked upon favorably in those occupations. Patricia Smart Flemming, senior office specialist with the CPI division of the Pinellas County Sheriff's Department, testified that she had learned about Mr. Freeland's physical condition a little bit at a time, as he never talked about it. She

stated that Mr. Freeland was a "stoic army type," "very erect," but even stiffer when in pain.

Tom Williams, who knew Mr. Freeland since 1992, observed definite changes in Mr. Freeland's behavior after he left Louisiana. Mr. Williams testified that Mr. Freeland was a "whirling dervish," and while working in Anniston before the accident, his nickname was "the flying squirrel." After the accident, while Mr. Williams only worked with Mr. Freeland for a day and a half, during which time Mr. Williams basically drove Mr. Freeland around, they associated as friends on several occasions. Mr. Williams testified that away from work, when it came to helping him move out of his house, he only assigned Mr. Freeland the job of driving, and he hired a crew to do the lifting that he and Mr. Freeland had done when Mr. Williams moved into his house.

Mr. Williams further testified that after he moved back to Alabama and became a co-owner in his own small broadcasting company, Mr. Freeland came to visit and assisted him somewhat in mending fences and cleaning up after hurricane Ivan. However, Mr. Freeland was not himself. Mr. Williams noticed that Mr. Freeland was moving slowly going up steps, and he complained of back and neck pain. Mr. Williams stated that there were major changes in Mr. Freeland's activity level. Where Mr. Freeland would usually jump right into work, such as cleaning up debris, he and Mr. Freeland had basically switched roles, in that Mr. Williams did the physical labor of moving debris, while Mr. Freeland drove the vehicle. Mr. Williams also testified that Mr. Freeland appeared to be using a lot of medication at that time.

The last testimony presented to the jury was the deposition testimony of Dr. Robert Martinez, a board-certified neurologist who examined Mr. Freeland on behalf of the defendants on January 11, 2006, exactly four years after Mr. Freeland's

27

first examination by his treating neurologist, Dr. Robert Vollbracht. At the time of the examination by Dr. Martinez, Mr. Freeland had been treating with Dr. Vollbracht continuously for four years and had recently received an injection of Botox into the muscles of his neck and back on December 22, 2005. Dr. Martinez stated that he spent two and one half hours examining Mr. Freeland, reviewing about three inches of medical records from Dr. Wade and Dr. Vollbracht, and dictating an eight page report. Mr. Freeland testified that Dr. Martinez actually spent twenty minutes examining him and talking to him.

Dr. Martinez testified that Mr. Freeland reported a pain level of three on the day of the exam. Dr. Martinez reported that, upon examination, he found no spasm of the neck or thoracic region and a normal range of motion for a forty-seven year-old patient. He found no impairment and no restrictions on the kind of work that Mr. Freeland could do. However, on cross-examination, Dr. Martinez stated that he did not order x-rays or MRI scans and admitted that the people who employed him did not send Mr. Freeland's x-rays from Dr. Wade, nor did he have the MRI scan and nerve conduction study from Dr. Vollbracht. Despite the absence of these diagnostic materials, Dr. Martinez testified that, "His bones of the neck were in the middle where they should be . . . .," and there was no fracture of the Luschka joint or inflamation of the ulnar nerves.

Dr. Martinez also testified that the injuries complained of after the accident were the same problems that Mr. Freeland was being treated for by Dr. Wade prior to the accident. More specifically, Mr. Freeland had received adjustments and treatments from Dr. Wade in Anniston, Alabama for a number of years. However, the last time he had seen Dr. Wade before the October 31, 2001 accident was a year and a half earlier on May 1, 2000. The record reveals that Dr. Wade had been a radio

client of Mr. Freeland's employer in Anniston with an on-air wellness program advocating the benefits of regular adjustments and chiropractic care.

Mr. Freeland was an avid runner and took advantage of an offering by Dr. Wade of a wellness package which included regular adjustments for approximately $33.00 per month. He compared the wellness visits with Dr. Wade to spa treatments and saw him for five years, from 1995 to May of 2000 for tight muscles and spasm due to painting and carpentry and other work on his house and rental properties. Therefore, Dr. Wade's records contained numerous notes regarding either neck, shoulder, or back pain, spasm, soreness and stiffness, as well as one complaint of arms and hands locking up from overuse. Dr. Wade's notes also contained a description of disk involvement in August 1995. However, Dr. Wade explained that this was evident because Mr. Freeland was walking crooked, twisting his pelvis due to *lower* back pain, which was his main complaint in 1995.

During Dr. Wade's deposition, counsel for the defendants read each visit aloud for confirmation by Dr. Wade. Every adjustment was accompanied by a complaint. Therefore, when Dr. Wade's deposition was read to the jury members, they heard evidence of the visit in August 1995 and a litany of thirty-eight individual wellness visits between January of 1997 and May 1, 2000, each one including complaints of neck, shoulder or mid or upper back pain from overuse. There was also one complaint in December of 1997 of pain and numbness in the right arm, one in December of 1998, and one in January of 1999 regarding numbness in the arms and hands with tingling in the right hand. At the end of 1998, a few of the visits were associated with an October incident wherein Mr. Freeland ran off the road in his vehicle to avoid a deer. However, Dr. Wade stated that those visits were just for stiffness and soreness and that there was no diagnosis of sprain. The wellness visits

29

decreased to eight in 1999 and to only two visits in 2000. The last visit to Dr. Wade was on May 1, 2000, with complaints of neck and mid-back pain due to painting.

When asked to explain the difference between the visits up to May of 2000 and the post-accident visits in November and early December of 2001, Dr. Wade stated that the difference was in the magnitude of the symptoms, the severity of the complaints, the swelling, and the restricted range of motion. Dr. Wade explained that he had 1992 x-rays of Mr. Freeland on file, and that prior to the October 2001 accident, there was no x-ray finding of a reversal of the lordotic curve, no stair-stepping indicating ligament damage, no Luschka joint compression, and no diagnosis of vertigo, cervical and thoracic sprain and cervical subluxation, all of which he found consistent with the trauma from the impact of the 2001 collision. Therefore, the jury should have taken this testimony of Mr. Freeland's treating chiropractor in consideration when evaluating the comments of Dr. Martinez, particularly in light of Dr. Martinez' testimony on cross-examination.

More specifically, Dr. Martinez reported that there was no head injury, even though the medical records had documentation of a head injury in at least three places. Dr. Martinez offered no explanation, except that he did not ask Mr. Freeland about a head injury. While he testified on direct examination that he saw no evidence of chipping at the Luschka joint, he admitted on cross-examination that if there had been a fracture or chipping of any bone in the 2001 accident, it would have healed by 2006. Moreover, Dr. Martinez further admitted that when a patient is receiving ongoing medical treatment, a physician may well find a lack of spasm and lack of limitation on the patient's range of motion. In the present case, Mr. Freeland had received Botox injections by Dr. Vollbracht on December 22, 2005, twenty days before his examination by Dr. Martinez on January 11, 2006. The chemical takes ten

to fourteen days to begin relaxing the muscles and inhibiting the pain response, and works for approximately three months. Therefore, Mr. Freeland was receiving the maximum benefit from the injections by Dr. Vollbracht at the time of the examination by Dr. Martinez.

It has long been held that, in general, the observations and opinions of the treating physician are to be accorded greater weight than those of a physician who has only seen the party for purposes of rendering an expert opinion concerning the party's condition. "However, the treating physician's testimony is not irrebuttable, as the trier of fact is required to weigh the testimony of all of the medical witnesses." *Freeman v. Rew*, 557 So.2d 748, 751 (La.App. 2nd Cir. 1990) (citations omitted), *writ denied,* 563 So.2d 1154 (La. 6/01/90). Ultimately, "the weight afforded a treating physician's testimony is largely dependent upon the physician's qualifications and the facts upon which his opinion is based." *Id.* "Thus, reduced to its essentials, the inquiry is whether, based on the totality of the record, the jury was manifestly erroneous in accepting the expert testimony presented by defendants over that presented by plaintiff." *Miller v. Clout*, 2003-0091, fn.3 (La. 10/21/03), 857 So.2d 458, 463.

Based upon the testimony in the present case, the jury should have given more weight to the cumulative evidence in the x-rays and findings of Dr. Wade, who treated Mr. Freeland before and after the accident, and to the MRI scan and nerve conduction studies of Dr. Vollbracht, who had been treating Mr. Freeland from January 2002 until the time of trial in 2006. To rely instead upon the findings of a physician who spent twenty minutes with Mr. Freeland in 2006, over four years after the accident in 2001, and who did not take or consult existing x-rays, MRI and nerve conduction studies, and to come to the conclusion that no compensable injury had

31

occurred in light of the description of the accident, itself, and the totality of the evidence, was clearly wrong. We can only surmise that there was jury confusion, which is evident in the note sent to the judge during deliberations, asking for clarification between an award for *any* injury and an award for *current complaints*.

In response to their query, the jury was then instructed by the trial judge to consider the testimony and evidence and the jury instructions that he had given them, which were available for review. Those instructions included the applicable legal principle that a defendant who causes harm to a plaintiff must take the plaintiff as he is, even if his injuries are more serious by reason of a pre-existing condition. The instruction further provided that if the accident results in aggravation of a pre-existing condition of pain or disability, the one responsible is liable both for the aggravation of the pre-existing condition and for any new injuries resulting from the accident. Therefore, given this legal precept and the greatly preponderant objectively-corroborated evidence, including the x-rays, MRI, and nerve conduction studies, a reasonable jury would have found that Mr. Freeland suffered new injuries and possibly some aggravation of a pre-disposition to muscle stiffness. However, the evidence was clear that Mr. Freeland was a very active person before the accident, and the jury should have been able to differentiate between soreness from overuse and trauma induced sprain and disk herniation.

There was overwhelming testimony that Mr. Freeland was fit and functioning very well physically before the accident, working at a strenuous job as a radio engineer, and doing the labor of maintaining various properties. Prior to the accident, he had not been to a medical doctor in many years. There was absolutely no evidence or testimony by a family doctor or treatment for even a cold, although Mr. Freeland did have an opthamologist. There was further mention of a couple of

32

minor bumps in the 1990s, including a three car pile-up, in which Mr. Freeland was the last car to stop, and in which he suffered no injuries. There were no medical reports associated with those minor accidents. In fact, the record contains a Department of the Army Certificate of Achievement awarded to Major Jerome T. Freeland on November 17, 1996, which states as follows:

> FOR SUPERIOR PERFORMANCE ON THE ARMY PHYSICAL FITNESS TEST THAT WAS CONDUCTED ON 19 OCTOBER 1996. YOUR ACHIEVEMENT OF A SCORE OF 292 IS A SIGNIFICANT ONE. THIS ACHIEVEMENT REFLECTS GREAT CREDIT UPON YOU, THE 1ST SIMULATION EXERCISE GROUPT, 1ST BRIGADE, 87TH DIVISION (EXERCISE), AND YOUR PROFESSIONALISM AS A SOLDIER.

Further, Mr. Freeland had stopped going to the chiropractor for wellness adjustments on May 1, 2000, over a year and a half before the accident on October 31, 2001. There was absolutely no evidence of an intervening accident in the weeks between the auto collision and Mr. Freeland's examinations by Dr. Wade and Dr. Vollbracht, and their respective x-rays, MRI ,and nerve conduction studies. After the accident, Mr. Freeland had an eleven percent (11%) impairment and was relegated to light duty work. Accordingly, having determined that Mr. Freeland sustained compensable injuries in the accident of October 31, 2001, we now turn to the issue of damages.

## Damages

Dr. Vollbracht diagnosed cervical disc protrusion/herniation at C6-7 with impingement on the thecal sac, cervical strain, thoracic strain, post traumatic headaches and bilateral occipital neuralgia, post traumatic positional vertigo, then post traumatic dizziness, and bilateral ulnar neuropathy, and assessed him with an eleven percent (11%) permanent impairment. He treated Mr. Freeland conservatively

without much success for a year before beginning the Botox injections, which finally brought Mr. Freeland measurable relief. It is anticipated that Mr. Freeland will need the injections indefinitely. Dr. Vollbracht further testified that Mr. Freeland's injuries have a future effect in their propensity to speed up and increase the severity of degenerative changes in Mr. Freeland's physical condition.

Mr. Freeland testified that prior to the accident, in addition to working in a field that he really enjoyed, he was much more physically active. He ran, played golf, exercised more, worked out with weights, played racquetball and basketball with his son, spent more time on the computer, and did more domestic maintenance in his leisure time. He stated that he can no longer repair jewelry as a hobby, that he has headaches and problems with concentration and focus, and can no longer read the schematics for detail work in cabinetry, even though no claim is being made for the earlier complaints of problems with his eyes.

Since the jury failed to award any damages, we are not bound to determine the highest or lowest point at which damages are reasonable. Instead, we award appropriate damages based on a de novo review. *LeBlanc v. Stevenson*, 00-157 (La. 10/17/00), 770 So.2d 766. The record in this case supports a general damage award of $50,000.00.

With regard to past medical expenses, Dr. Vollbracht testified that his medical charges at the time of his deposition were $20,352.40. Dr. Wade testified that his charges were $1,260.00. Accordingly, we will award past medical expenses of $21,612.40. With regard to future medical expenses, Dr. Vollbracht testified that Mr. Freeland would continue to require future Botox injections at an estimated cost of $5,400.00 to $8,000.00 per year for an indefinite period, possibly for the remainder of his life. The Social Security Life Expectancy Tables in the record indicate that, at

34

48 years of age at the time of trial, Mr. Freeland's life expectancy was 29.56 years, and his work life expectancy was 16 ½ years. Accordingly, Mr. Freeland seeks future medical expenses for the Botox injections at $5,800.00 per year for a period somewhere between his work like expectancy, which would total $98,600.00, and his full life expectancy, which would total $171,000.00. We find an award of $98,600.00 supported by the record and reasonable under the circumstances.

We now turn to the damage element of loss of future earning capacity which refers to one's potential earning capacity. *Batiste v. New Hampshire Ins. Co.*, 94-1467 (La.App. 3 Cir. 5/3/95), 657 So.2d 168. While "[t]he very nature of lost earning capacity makes it impossible to measure the loss with any type of mathematical certainty." *Finnie v. Vallee*, 92-2122 (La.App. 4 Cir. 1993), 620 So.2d 897, 901, a plaintiff need only to reasonably establish his claim.

Jeff Peterson, the only occupational rehabilitation specialist who testified at trial, stated that according to his research in the Occupational Outlook Handbook and other manuals, his review of the medical records, and his interviews with Mr. Freeland and Tom Williams regarding the actual duties that Mr. Freeland performed as a radio engineer, that Mr. Freeland could not return to the work that he did before the accident. He testified that in small radio markets, the chief engineering job description entails medium to heavy duty labor because of the tasks involved and the frequency of lifting, carrying, bending and stooping. This is consistent with Tom Williams' testimony that Mr. Freeland could not change the tubes in an FM transmitter with a bad back or neck, describing them as having been "designed by the Marquis de Sade." He further stated that Mr. Freeland could not be part of a group unloading 700-800 pound satellite dishes after the accident.

Mr. Peterson's testimony indicates that while the position of chief engineer in the large markets may be described as lighter duty because it is more managerial and administrative, and because the chief engineer has other engineers and technicians to assist him, Mr. Freeland would basically have to start over with the heavy duty work and work his way up, as with all jobs. He stated that nothing in Mr. Freeland's work history indicates that he ever sat behind a desk in the radio field. Mr. Peterson stated that radio technicians earn between $28,000.00 and $80,000.00 annually; therefore, where Mr. Freeland's income had been between $45,000.00 to $56,000.00 prior to the accident, the most realistic comparison between his earning capacity is the difference between his pre-accident earnings and his $38,000.00 salary as a detention officer, which is consistent with the testimony of the economic expert, Dr. Michael Kurth.

The record contains overwhelming evidence of Mr. Freeland's experience and education, and his ability to have continued in radio broadcast engineering, were it not for the accident on October 31, 2001. Already interested in radio broadcast engineering at the age of seventeen, Mr. Freeland attended the Radio Electronics Institute in Sarasota, Florida. He earned his third class, then second class, then first class radio/telephone license, with radar endorsement from the FCC. He worked his way through college customizing vans with video and sound systems, was active in the ROTC, and graduated from the University of South Florida in 1980 with a Bachelors degree in International Relations. Upon graduation, he was commissioned as a second lieutenant in the Army and served on active duty for six years, working in communications and attaining the rank of captain. In 1986, he went into the reserves, basically in acquiescence to his wife's wishes, and was called back to active duty a few times as a special projects officer.

While stationed in Germany from 1980 to 1982, he worked in the communications-electronics systems division. On his own initiative, he developed a direct exchange program for missile equipment, which saved the Army millions of dollars, and which became implemented worldwide. This initiative earned him his first Army Commendation Medal on June 8, 1982, as a First Lieutenant, within two years of graduating from college, "for exceptionally meritorious achievement in successive positions as a logistical staff officer." The award further states that "his efforts were directly responsible for identification of numerous areas for improved logistical support to the theater" and cites him for his "dedication, motivation, initiative, and outstanding performance of duty."

Mr. Freeland received another Army Commendation Medal for developing a plan to train high level staff on computer war games, for which he conducted briefings in Washington, D.C. and at the Pentagon, resulting in multiple nationwide training divisions. He was sent to El Salvador to put together a satellite communications program and received The Army Commendation Medal for that project as a Major on September 30, 1994. The record contains several certificates evidencing at least four of Mr. Freeland's Army Commendation Medals, as well as various Certificates of Achievement while in the active army and in the reserves dating up to 1996. Mr. Freeland testified that he thinks he received nine Army Commendation Medals, as well as other medals. He retired from the reserves in the summer of 2000.

While in the reserves, and between active duty projects, Mr. Freeland owned various businesses, and in the 1990's he assisted a chief engineer at a small AM station, and subsequently became chief engineer for Tom Williams at Susquehanna Radio from the mid 1990's to 2000 in Alabama. That system was

moved to Atlanta, and Mr. Freeland was asked to help them get their studios set up there. In the meantime, Tom Williams was hired by APEX, and he recruited Mr. Freeland in the spring of 2001. Mr. Freeland had been with the company for about seven months when the accident occurred.

Accordingly, we have a cohesive history of a career in communications, electronics, and radio that began for Mr. Freeland at the age of seventeen and eventually led to a solid career in radio, broadcast engineering. Given the ample evidence in the record regarding Mr. Freeland's education and experience, his ingenuity, initiative, and dedication, and the testimony of Tom Williams regarding Mr. Freeland's work ethics and abilities, a reasonable juror would have concluded that Mr. Freeland would still be working in radio broadcasting but for the auto accident in 2001.

With regard to Mr. Freeland's education, the record on appeal contains his diploma from the University of South Florida, indicating his bachelor's degree was earned in 1980. Mr. Freeland also indicated a degree from the University of Southern California in 1982 in Systems Management. His military records, pursuant to the printout in the record entitled, "Personnel Qualification Record (Commissioned Officer)," indicates an education level of "6th year college" and an education certification of "Master's Degree." Mr. Freeland testified that while stationed in Germany, he took extension courses through the University of Southern California (USC) in Systems Management, and his military printout indicates a major in Systems Management. The defendants offered somewhat conflicting evidence by entering transcripts from USC showing only six hours completed in 1981. However, Mr. Freeland was apparently in Germany in 1982, as well. We note that the record certification from USC states that the records provided are the "records described in

the subpoena." The record provided to us on appeal contains 1,532 pages and does not appear to have the subpoena attached. Accordingly, we do not know whether the subpoena requested the records from 1982.

Moreover, Mr. Freeland's counsel pointed out that the certification of records from USC states that there may be additional records under a different name or spelling. In any event, the defendants do not address the issue on appeal, and we find that the question of Mr. Freeland's Master's Degree is not determinative in this case, as Mr. Freeland is not making a claim for a high-end salary based solely upon his post-graduate education. He is simply requesting that he be reinstated to the earning potential that he had before the accident, which the economic expert in this case estimated at $48,000.00 per year.

More specifically, Dr. Michael Kurth, a full professor and department head of Finance and Economics at McNeese University in Lake Charles, testified regarding Mr. Freeland's lost wages. Based upon Mr. Freeland's social security earnings records and his tax returns, Dr. Kurth placed Mr. Freeland's pre-accident earning capacity at $48,000.00 per year. After the accident, Mr. Freeland's actual income dropped to $11,625.00 in 2002, but by 2006, he had worked his way back up to $38,380.00. Calculating a one percent (1%) salary increase per year, and factoring in the difference between his benefits, which were considered higher with the Sheriff's Department, thereby decreasing the loss, Dr. Kurth calculated a past lost income of $112,633.00. Using the same methodology, but applying a present value discount of two and one half percent (2 ½ %), and anticipating a 16 ½ year work life expectancy, Dr. Kurth calculated a future loss in income of $161,987.00. The defendants did not present an economic expert of their own. We find Dr. Kurth's

recommendations appropriate, and make lost income awards consistent with his analysis.

In addition to loss of past income and loss of future earning capacity, Dr. Kurth provided an additional figure for "non-market" or household services. Dr. Kurth explained that if Mr. Freeland worked around the house and yard for ten hours a week before the accident, but could no longer do that after the accident, then the value of those services could be estimated at $12.00 per hour, or $120.00 per week, resulting in lost services in Mr. Freeland's case of $113,993.00. He stated that the studies vary on this element of damages because every household is different, and that the figure should be determined by listening to the testimony of Mr. Freeland regarding his pre-accident activities and his post-accident activities.

The record indicates that Mr. Freeland and his son lived with Mr. Freeland's sister for a while after the accident, but the period of time is uncertain. At the time of trial over four years after the accident, Mr. Freeland was buying a very small house, 900 square feet, with a very small yard. Mr. Freeland no longer has rental properties to maintain and does very little yard work. Accordingly, we find the record too indefinite on this element of damages and decline to make a separate award for non-market services.

Dr. Kurth also provided a figure for the lost perquisites that Mr. Freeland received while at APEX Broadcasting in the form of hotel lodging, vehicle use, as well as food and gasoline provisions. He valued those provisions at $12,000.00 per year and estimated a loss of $219,617.00 for that element of damages. Again, he stated that this figure could be adjusted by the fact-finder and that it was being offered as a means of estimating damage. While we believe that the $1,000.00 per month figure is conservative for food, housing, car, and gasoline, we believe that the

40

proof is too tenuous in this case where the record indicates that Mr. Freeland has had the use of a vehicle, laptop, and, possibly, a cell phone at various times during his three jobs with the Sheriff's Department as well. Additionally, there is evidence that Mr. Freeland had some perquisites in his employment before coming to Lake Charles. Based upon the record in this case, we cannot extract the different perquisites from the different salaries so as to quantify them. Accordingly, we decline to award this element of damages.

Dr. Kurth admitted that there are unique areas of complexity in this case due to the complicating factor of Mr. Freeland's termination immediately after the accident and due to the fact that Mr. Freeland was still in his probationary period as detention deputy at the time of trial. He stated that Mr. Freeland could lose that position and suffer an even greater loss than those calculated. He further stated that the work expectancy tables still being used to project income are twenty years old and use the age of 65 as the end point of work life. Yet, work life expectancy is now beyond 65, and Mr. Freeland's loss would be greater if the tables were current.

During Dr. Kurth's deposition, counsel for the defendants attempted to have Dr. Kurth reduce his calculation of lost income in 2002 by eight months, arguing that because Mr. Freeland received unemployment benefits during that time, he was out of work due to his termination by APEX, and therefore, for reasons unrelated to the accident. Dr. Kurth ran the calculation but made it clear that the determination of whether Mr. Freeland was out of work for reasons unrelated to the accident was a fact that would have to be determined by someone other than himself. He had already testified that, but for the accident, it would not have taken Mr. Freeland long to return to his former salary based upon his skills, his communications work in the military, his civilian work history, and the fact that he had a child to support. The

41

record provides ample support that Mr. Freeland would have been able to maintain his level of income. He wanted to work; he had never applied for unemployment benefits before; he had the skills to stay in radio broadcasting; he was working in radio broadcasting in Atlanta when he was recruited to come to Louisiana.

There simply are no means by which to determine how long it would have taken Mr. Freeland to find another job after termination if Mr. Bourgeois had not run a stop sign and broadsided Mr. Freeland. However, there is evidence that Mr. Freeland could not have continued to do the work that he was doing for Tom Williams at APEX with the conditions in his neck and back that developed after the accident, as Mr. Williams testified. There is also overwhelming evidence in the record of Mr. Freeland's ingenuity, industriousness, dedication, and tenacity that preponderates in favor of Mr. Freeland's continued employment in radio broadcasting but for the accident caused by Mr. Bourgeois. The fact that Mr. Freeland's employer terminated him the day after the accident does not relieve the defendants of their obligation. "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La.Civ.Code art. 2315.

IV.

## CONCLUSION

Based upon the foregoing, where we find clear error in the jury's evaluation of the evidence at trial, we reverse the jury verdict in favor of the defendants and award Mr. Freeland damages as follows: $112,633.00 for past lost wages, $161,987.00 for future lost wages, $21,612.40 for past medical expenses, $98,600.00 for future medical expenses, and $50,000.00 in general damages.

**REVERSED AND RENDERED.**