## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 07-384

ELAINE SMITH

VERSUS

TOWN OF OLLA

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - #1E
PARISH OF LASALLE, NO. 04-03927
BRENZA IRVING, WORKERS' COMPENSATION JUDGE

**********

## MARC T. AMY
## JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Michael G. Sullivan, Judges.

**AFFIRMED AS AMENDED; REVERSED IN PART. ADDITIONAL ATTORNEY FEES AWARDED FOR WORK PERFORMED ON APPEAL.**

**Robert McCuller Baldwin**
**Brian P. Bowes**
**D. Brian Allen**
**Travis Oliver, IV**
**Hudson, Potts & Bernstein, L.L.P.**
**Post Office Drawer 3008**
**Monroe, LA  71210-3008**
**(318) 388-4400**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Town of Olla**

**Kathryn Fowler Van Hoof**
**Van Hoof Law Firm**
**Post Office Drawer 339**
**LeCompte, LA  71346**
**(318) 776-4836**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Elaine Smith**

AMY, Judge.

In this workers' compensation matter, the employee alleges a work-related accident and injury. The employer filed a 1008 form to compel the employee to submit to a physical examination. The employee reconvened, seeking, among other things, SEBs, TTD benefits at the correct rate, penalties and attorney fees. Following a hearing, the workers' compensation judge found in the employee's favor. The employer appeals. For the following reasons, we affirm as amended and reverse in part. Additional attorney fees are awarded for work performed on appeal.

## Factual and Procedural Background

The record indicates that Elaine Smith (Smith) was hired by the Town of Olla (the Town) on May 5, 2003, as a garbage truck driver. According to Smith, "it was explained to [her] by [her] supervisor and the mayor that if [they] were ever shorthanded [she] would have to ride the back of the truck and pick up garbage instead of driving the truck." Smith testified that such a situation arose on Thursday, October 16, 2003. She explained that as the garbage truck was making its route, she anticipated that the driver was going to stop at a particular spot, but he did not. Consequently, "[she] jumped off the truck before it stopped and [she] twisted [her] knee and [she] felt it pop." Smith testified that as she was not in any immediate pain, she did not mention the accident to her co-workers. She worked two more hours before going on her lunch break. According to Smith, she spent the remainder of the day studying for a license to become certified as a sewer and water technician.

Smith testified that on the next day, Friday, October 17, 2003, she drove the garbage truck and that this shift lasted for an hour and a half. She studied for the rest of the day. Smith denied any problems with her knee. However, she testified that when she awoke on Saturday morning, her knee was swollen and hurting. Despite

her symptoms, Smith returned to work on Monday and worked her full shift. She stated that she was in pain. Nevertheless, Smith testified that it was not until Tuesday that she informed her supervisor, Henry Ross (Ross), that her knee was hurting her. Ross approved Smith's request to see a doctor.

Smith first presented to Hardtner Medical Center (Hardtner) emergency room where she was diagnosed with a knee strain and given medication. She subsequently visited her family physician, Dr. Kenneth Mauterer, Jr., who ordered x-rays and also prescribed her medication. The x-rays did not show any significant abnormalities. Noting tenderness over the medial meniscus and that the medication was not working, Dr. Mauterer recommended that she see an orthopedic surgeon. Upon examining an MRI of Smith's knee, Dr. C. Terry Texada, Smith's orthopedic surgeon, found that the medial meniscus was intact. After utilizing conservative treatment, such as physical therapy and intra-articular injections, to no avail, it was recommended that Smith undergo surgery. The record indicates that the workers' compensation carrier for the Town requested a second opinion regarding whether surgery was medically necessary. According to Dr. Douglas Brown, the physician who was chosen to render a second opinion, he did not "think she needed to have her knee arthroscoped."

The record further indicates that on June 1, 2004, Ronald Reibe (Reibe), the casualty claims manager for Risk Management, Inc. (RMI), the third party administer for the Town's workers' compensation claims, filed a disputed claim for compensation form. Reibe alleged that Smith "refuses our IME for the "tie-breaker" as it relates to the necessity of surgery.[1] According to Reibe, Smith also abandoned treatment in January 2004.

---

[1] This issue was later rendered moot because prior to the hearing, Smith submitted to physical examination.

Smith reconvened against the Town seeking temporary total disability benefits (TTD benefits) at $196.98 per week, instead of $196.00 per week, approval of arthroscopy as recommended by Dr. Texada, penalties and attorney fees, and interest on all amounts. An amended reconventional demand was filed in which Smith requested TTD benefits and supplemental earnings benefits (SEBs), mileage reimbursement, vocational rehabilitation, penalties and attorney fees, and interest on all amounts. In a second amended reconventional demand, penalties and attorney fees were sought for the Town's failure to authorize follow-up appointments with Dr. Texada. A third reconventional demand was filed for the Town's refusal to pay an x-ray bill associated with a court-appointed IME; penalties and attorney fees were requested.

Following a December 2005 hearing, the workers' compensation judge ordered that the Town approve the arthroscopic surgery and "pay any additional reasonable and necessary medical treatment recommended by Dr. C. Terry Texada." The workers' compensation judge further ordered the Town to reimburse Smith for her mileage expenses, provide vocational rehabilitation, and to:

> pay temporary total disability benefits to ELAINE SMITH for the period May 12, 2004 to November 1, 2004 and supplemental earnings benefits based on actual wages earned at Bill's Dollar Store from November 1, 2004 until employment ended at Bill's Dollar Store on March 21, 2005; and supplemental earnings benefits based on zero earnings from the date employment ended at Bill's Dollar Store on March 21, 2005 through April 29, 2005; and supplemental earnings benefits continuing after April 29, 2005 and as authorized by law.

The workers' compensation judge further held that the Town owed Smith an additional ninety-eight cents for each week that "temporary total disability benefits were paid at the incorrect rate, from date of injury through May 12, 2004."

3

The Town was assessed with multiple penalties: (1) a $2,000.00 penalty for the failure to correct the discrepancy in the compensation rate; (2) a $2,000.00 penalty for the termination of and failure to reinstate TTD benefits; (3) a $2,000.00 penalty for the failure to reimburse Smith for her mileage expenses and for the failure to provide vocational rehabilitation; and (4) a $2,000.00 penalty for the failure to authorize follow-up appointments with Dr. Texada and for failure to pay the medical expenses associated with the court-appointed IME. Smith was awarded $10,000.00 in attorney fees, plus interest, and all costs.

The Town appeals, raising the following issues:

I. Whether the Workers' Compensation Judge was clearly wrong and manifestly erroneous by calculating TTD's at 67% of weekly wage rather than 66 2/3 % as mandated by law.

II. Whether the Workers' Compensation Judge was clearly wrong and manifestly erroneous by finding that [Smith met] her burden of proof to prove that she was injured at work with only her testimony alone when the two essential elements to do so were not satisfied: (1) no other evidence discredits or casts serious doubt upon [Smith's] version of incident [and] (2) [Smith's] testimony is corroborated in [sic] by the circumstances following the alleged incident.

III. Whether the Workers' Compensation Judge was clearly wrong and manifestly erroneous by awarding [Smith] supplemental earnings benefits even though she has been released to full duty by two doctors and she has failed to submit any pay stubs to the insurer within thirty (30) days of the termination of the week which is being claimed as required by law.

IV. Whether the Workers' Compensation Judge was clearly wrong and manifestly erroneous awarding [Smith] penalties and attorney fees for [the Town's] termination of Workers' Compensation Indemnity and Medical Benefits where the [Town] was not arbitrary and capricious and reasonably controverted [Smith's] allegations [that] her [knee] injury arose from her employment.

Smith answered the appeal, seeking additional attorney fees for work performed on appeal.

4

**Discussion**

*Work-Related Accident and Injury*

The Town contends that Smith did not prove by a preponderance of the evidence that there was a work-related accident and injury. It questions Smith's credibility in that she denies any previous knee injury or complaints. Accordingly, the Town alleges that Dr. Texada's opinion should be accorded little weight in that it was based on an inaccurate history from Smith. Further, the Town "argues that if an accident did occur, [Smith] has not presented evidence of disability arising from accident. She is currently able to work full time."

A workers' compensation claimant has the burden of proving by a preponderance of the evidence a work-related accident and injury. *Hebert v. C.G. Logan Constr., Inc.*, 06-612 (La.App. 3 Cir. 11/2/06), 942 So.2d 77. This court explained:

> A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. *Bruno v. Harbert Int'l, Inc.*, 593 So.2d 357 (La.1992). Corroboration of the worker's testimony may be provided by the testimony of co-workers, spouses, friends, or by medical evidence. *Id*.

*Id*. at 80. "Whether a claimant has carried his burden of proof and whether testimony is credible are questions of fact to be determined by the workers' compensation judge." *Id*. at 79. The factual findings of the workers' compensation judge are subject to the manifest error standard of review. *Id*.

In her reasons for ruling, the workers' compensation judge explained:

In regard to the issue concerning whether [Smith][2] was injured while working in the course and scope of her employment with [the Town], this Court is persuaded she was. [Smith] described an unexpected, unforeseen actual, identifiable, precipitous event occurring October 16th, 2003. She testified she stepped off the back of a moving garbage truck while working for the Town of Olla. She recalls twisting her right knee, feeling pain and hearing a pop.

[Smith's] testimony concerning the occurrence of an accident was credible and supported by medical evidence. The [Town's] report of injury recorded the occurrence of the accident with a resulting torn cartilage of [Smith's] right knee. On October 22nd, 2003, only six days after sustaining the injury to her knee, Elaine Smith presented to the emergency room of Har[d]tner Medical Center. She complained of right knee pain since the Friday of the previous week. She was diagnosed with a knee strain, prescribed medications and released from work. [Smith] was examined by her family physician, Dr. Kenneth Mauterer, on October 28th, 2003. She complained of right knee pain. At that time, [Smith] did not recall doing anything to hurt her knee. However, as of the November 5th, 2003 visit with Dr. Mauterer, [Smith] recalled the event occurring prior to the onset of pain and swelling. She recalled jumping from the garbage truck and having the difficulty with her knee.

During the October 28th, 2003 visit, Dr. Mauterer noted [Smith's] knee was very tender over the medial meniscus. Effusion was noted. As of November 5th, 2003, [Smith] continued with complaints of pain. Dr. Mauterer noted, "Extremely tender over medial meniscus and she may have a tear." She was referred to an orthopaedic physician and Dr. Mauterer noted, "She may require scoping."

The injury was reported to [Smith's] supervisor within the timeframe required by Louisiana Revised Statute[s] 23:1301. He authorized medical treatment. The mayor of the Town of Olla certainly did not question the occurrence of [Smith's] accident. He, instead, considered the actions of Risk Management a "lack of progress due to mismanagement."

No evidence discredits nor casts serious doubt on [Smith's] version of the incident and her testimony is corroborated by the circumstances following the incident. The record is void of any evidence indicating [Smith] had difficulties performing her job due to complications with her right knee. However, following the October 16th, 2003 incident, complications with her knee began and resulted in a disability.

---

[2] We note that in her reasons for ruling, the workers' compensation judge used both "claimant" and "defendant" to refer to Smith. For consistency of discussion, the names have been changed to Smith and the Town.

6

Jurisprudence has held a workers' compensation claimant's disability is presumed to have resulted from an accident if before the accident the injured person was in good health, but commencing with the accident symptoms of the disabling condition appeared and continuously manifested themselves, provided either that there is sufficient medical evidence to show there to be a reasonable possibility of a causal connection between the accident and disabling condition, or that the nature of the accident, when combined with other facts of the case, raises a natural inference through human experience of such causal connection. Therefore, this Court finds that [Smith] was injured while working in the course and scope of her employment with the Town of Olla on October 16th, 2003. According to Louisiana Revised Statute[s] 23:1301, an employer is liable for workers' compensation benefits and necessary medical expenses when an employee receives personal injury by accident arising out of and in the course and scope of her employment.

After reviewing the record, we find that it supports a determination that Smith proved by a preponderance of the evidence that her accident occurred in the course and scope of her employment with the Town. Smith testified that she injured her right knee on October 16, 2003 while jumping off the back of a garbage truck. She asserted that her knee twisted and that she felt it pop.

According to Smith, her accident happened at 10:00 a.m. She stated that "at the time I didn't think anything about it. I went on and did my regular work. We worked until about 12 o'clock." Smith testified that she was not in any severe pain, and consequently, she did not tell anyone of her injury. In fact, the next day, Smith was able to return to work without incident. It was not until Saturday morning that she experienced pain and swelling in her knee. According to her testimony, there was not any intervening event between Thursday and Saturday that resulted in an injury to her knee.

Although her knee was swollen, Smith returned to work on Monday morning and worked a full day. She stated that even though her knee was bothering her, she did not mention it to anyone because she "didn't know what was going on[.]"

7

However, on Tuesday, she spoke with Ross, her supervisor, and "told him that [her] knee had been hurting and [she] didn't know why. And [she] asked him if [she] could go to the doctor."

According to Hardtner medical records, Smith presented to its emergency room on Wednesday, October 22, 2003 complaining of "[right] knee pain since Friday of last week." She stated that "five days ago," her knee started swelling and the pain increased. Smith was diagnosed as having a strained right knee. The record indicates that she was taken off of work for a couple of days and prescribed medication. Smith testified that the emergency room physician told her to follow up with her family physician if she was not feeling better.

According to Smith, she was not able to get an appointment with her family physician, Dr. Mauterer, until a week later. When she presented to Dr. Mauterer on October 28, 2003, she complained of right knee pain. Dr. Mauterer's notes reflect that Smith said that "she ha[d]n't done anything to hurt it. She has to use the [right] leg a lot when driving a truck." On physical examination, Dr. Mauterer noted that she was "[v]ery tender over medial meniscus of [right] leg down into the front part of leg." X-rays showed "no abnormalities other than a little fluid." Dr. Mauterer gave Smith a prescription for her pain and scheduled a return appointment for the following week. According to a work excuse that was entered into evidence, Smith was restricted from driving for a week, and Dr. Mauterer set her return to work for November 6, 2003.

On November 5, 2003, Smith revisited Dr. Mauterer, complaining that she was "still having pain in [right] knee on medial aspect" and that the medication was not working. According to Dr. Mauterer's notes, Smith related to him that:

> [S]he doesn't remember injuring the knee. She drives a truck & uses her knee a lot & thought it might [be] from that but apparently one of the workers wasn't there & she worked the back of the truck. She jumped off before the truck stopped & she remembered she had some difficulty. This was on a Thursday. The next night is when the knee started hurting her & swelling. She wasn't sure if it was related so she didn't say anything.

Because Smith was "[e]xtremely tender over [the] medial meniscus[,]" Dr. Mauterer opined that "she may have a tear." He, therefore, recommended that she see an orthopedic surgeon as she "may require scoping." Dr. Mauterer stated that Smith could "not return to work until seen by [an] orthopedist."

On November 13, 2003, Smith met with Dr. Texada, an orthopedic surgeon, and informed him that she had "jumped off the back of a garbage truck 1 month ago injuring the knee." When examining her, he found "tenderness along the medial joint line." Believing that Smith may have a medial meniscal tear, Dr. Texada ordered an MRI of her right knee.

The MRI showed "small to moderate sized joint effusion and low-grade chondromalacia[3] patella on both facets." The medial meniscus was intact. Dr. Texada testified that based on these findings, he administered an intra-articular injection to try to alleviate Smith's symptoms. He also recommended that she return to physical therapy. He noted that she "may need to consider doing an arthroscopic exam if this doesn't resolve." Dr. Texada advised that Smith could not return to work.

Dr. Texada did not see Smith again until January 6, 2004 wherein he noted that her pain was still severe. His plan was to "[p]roceed with right knee arthroscopy with possible lateral release and excision of medial plica on 02/02/04." Dr. Texada

---

[3] According to Dr. Texada, chondromalacia is "a softening of the cartilage, and then ultimately becomes, you know, very degenerative[.]"

explained that Smith did not undergo surgery because the workers' compensation carrier requested a second opinion.

Dr. Brown, an orthopedic surgeon, evaluated Smith on January 23, 2004 at the request of RMI. According to the history given to him, Smith had jumped off the back of a garbage truck and "twisted her right knee. She said that since that time - course, I was seeing her some three months later - that she was having some occasional swelling, a sense of popping and pain and caused her to limp." Smith denied any prior knee injuries. Dr. Brown stated that he reviewed some of the records of Dr. Mauterer, the October 22, 2003 Hardtner emergency room record, the June 17, 2004 record from Dr. Texada, and records from Smith's physical therapy sessions. Additionally, he examined her and reviewed her MRI. Based on his observations and findings, Dr. Brown concluded:

> I didn't think she needed to have her knee arthroscoped. I thought that she needed more than that a brace which would hold her kneecap straight and based on my exam that day I felt like she could go ahead and work as a garbage truck driver, which is what she had been doing. So it looked like her weight had a lot to do with the early softening of the cartilage in her kneecap and she did not describe a direct blow to the knee, which would be something that could cause this in an accident. This normally doesn't occur with a twisting injury, so I felt like it was a preexisting problem that might have been somewhat aggravated by the accident, but she had resolved it when I saw her.

Dr. Brown clarified that his findings were consistent with someone who had this condition prior to October 16, 2003, the date of Smith's accident.

Upon further questioning, Dr. Brown testified that he did not disagree with the knee strain diagnosis given at Hardtner. Additionally, he testified that Dr. Mauterer's recommendation of scoping seemed reasonable in light of Smith's injury and complaints. Of notable significance, Dr. Brown agreed with defense counsel's assertion that if Smith had no knee complaints close in time before the incident and

10

then with the incident the knee complaints began, the incident aggravated the condition. According to Dr. Brown's testimony, if all of Dr. Texada's records were made available to him, his opinion may have changed at the time of his evaluation of Smith.

Dr. Texada did not see Smith again until May 27, 2004. During this visit, Dr. Texada noted that Smith was still "symptomatic, especially along the medial aspect of the knee. She has recurring effusion and persistent pain. She has not been able to return back to work." He was still of the opinion that Smith had a symptomatic plica which was related to the garbage truck incident. He treated Smith conservatively by giving her another intra-articular injection and referring her back to physical therapy.

During her June 14, 2004 visit, Dr. Texada noted that despite the negative MRI results, he still opined that Smith had a symptomatic plica and possibly a meniscal tear. He also noted that Smith was to be seen for a third opinion.

Dr. John Fairbanks, an orthopedic surgeon, examined Smith on October 5, 2004 to render a third opinion regarding her condition. He stated that he reviewed Smith's medical records and the notes of Dr. Mauterer, Dr. Texada, and Dr. Brown. After reviewing the MRI, he noted that there was fluid in the joint and low grade chondromalacia of the patella. Dr. Fairbanks explained that, "the probabilities are very high that if she does have chondromalacia patella in that knee, which is more common than it's not common, that it would be a pre-existing condition[.]" When asked whether he thought that Smith's injury was work-related, Dr. Fairbanks answered that he did not "think she ha[d] anything objective you c[ould] hang a hat on to call this an on-the-job injury."

11

According to Dr. Fairbanks, Smith would not have benefitted from surgery and could resume her normal activities. He explained how he reached this conclusion:

> Well, number one, is lack of any kind of physical findings that would suggest an indication for an arthroscopy being of benefit to the patient. Number two, and very important, is that with her provocation injection she didn't get any kind of semblance of improvement in her pain. And number three, was a lack of any kind of MRI findings. Number four, was the fact that there was -- I felt as though might be -- no. I felt as though, again, there just weren't any indications for her to have surgical intervention. And I was trying to be liberal in my approach. But I just couldn't find anything there.

When asked whether it was reasonable for Dr. Texada to recommend an arthroscopic exam, Dr. Fairbanks maintained that:

> I think it was a reasonable opinion if the patient has been paying for it out of her own pocket. But this is an independent medical evaluation considering -- concerning an injured worker, and for me to be unbiased and try to be objective, I need something to hang my hat on to say that Olla or her work comp carrier should pay for these services.

Dr. Fairbanks clarified that he did not "feel as though her stepping off the garbage truck in Olla is something that they [the Town] should be held -- liable for. I just can't find that." Further, with regard to the duration of Smith's absence from work, Dr. Fairbanks testified that "in a work comp issue of this magnitude, somebody should get back to work within six to eight weeks if you've done everything that you can do to help them." When asked his opinion as to how long Smith should have remained off of work, Dr. Fairbanks answered, "I think a maximum for subjective complaints, without objective evidence of compensable injury, is a maximum three months."

The Town alleges that the findings of Dr. Brown and Dr. Fairbanks negate the likelihood that Smith suffered a work-related accident and injury. It reiterates that Dr. Brown opined that Smith's chondromalacia was a pre-existing condition which was

related to her weight. Likewise, Dr. Fairbanks stated that there was no objective evidence of a work-related injury. He opined that Smith's condition was degenerative in nature.

It is within the province of the workers' compensation judge to assess the credibility of the physicians who examined and/or treated Smith. *Hebert*, 942 So.2d 77. This court recently stated, in *Freeland v. Bourgeois*, 06-932, p. 31 (La.App. 3 Cir. 1/24/07), 950 So.2d 100, 119-20, that:

> [I]n general, the observations and opinions of the treating physician are to be accorded greater weight than those of a physician who has only seen the party for purposes of rendering an expert opinion concerning the party's condition. However, the treating physician's testimony is not irrebuttable, as the trier of fact is required to weigh the testimony of all of the medical witnesses." *Freeman v. Rew*, 557 So.2d 748, 751 (La.App. 2nd Cir.1990) (citations omitted), *writ denied*, 63 So.2d 1154 (La.6/01/90). Ultimately, "the weight afforded a treating physician's testimony is largely dependent upon the physician's qualifications and the facts upon which his opinion is based." *Id*.

According to Smith's testimony, she met with Dr. Brown and Dr. Fairbanks on one occasion each and then only for very brief periods of time. The record indicates that she visited with Dr. Texada approximately five times over the course of a year. In light of this evidence, we conclude that the workers' compensation judge was not manifestly erroneous in according greater weight to the observations, findings, and opinions of Dr. Texada.[4] *See Spell v. Conn Appliances, Inc.*, 97-309 (La.App. 3 Cir. 10/8/97), 702 So.2d 797 (wherein the workers' compensation judge, who noted that

---

[4] In discounting Dr. Fairbanks' opinion, the workers' compensation judge remarked:

This Court is unable to give substantial weight to the opinion of Dr. Fairbanks. It seems that his medical opinion is clouded and overshadowed by his desire to prevent the Town of Olla from suffering any liability for [Smith's] injury. His opinion cannot be considered unbiased, reliable nor independent. Nevertheless, even he eventually noted the absence of a reason to denounce Dr. Texada's thoughts concerning [Smith's] need for physical therapy and the arthroscope. He had no reason to disagree with Dr. Texada's opinion that claimant should remain off work.

the opinion of the claimant's treating physician differed with that of three other physicians, gave great weight to the treating physician's opinion insofar as he had observed the claimant over a ten-month period).

We now turn to the Town's contention that Smith is not credible because she denied any prior knee injuries. The Town references a notation in the records of Dr. Mauterer in which it states, "[s]he previously injured it [her knee] yrs ago playing basketball." Further, in a record dated March 24, 1999, Dr. Mauterer noted that Smith had "some problems with her knees."

At trial, Smith denied ever injuring her knee playing basketball and disputed telling Dr. Mauterer such. She testified that on March 24, 1999, she had complained that her ankle, not her knee, was causing her problems.[5]

Although there may have been an alleged discrepancy between Smith's testimony and the notations in her medical records, the workers' compensation judge was free to accept Smith's testimony that she never had any previous problems with her knees. *Harbor v. Christus St. Frances Cabrini Hosp.*, 06-593 (La.App. 3 Cir. 11/2/06), 943 So.2d 545.

Based on the foregoing testimony and records, we find no manifest error in the trial court's conclusion that Smith proved by a preponderance of the evidence a work-related accident and a disabling condition. The evidence shows that she was in relatively good health prior to her accident and that after her accident, she experienced persistent knee problems. *See Fluitt v. Christus Health Cent. La.*, 05-945, p. 13 (La.App. 3 Cir. 6/28/06), 935 So.2d 369, 379, *writ denied*, 06-2302 (La. 12/8/06), 943 So.2d 1094 (citing *West v. Bayou Vista Manor, Inc.*, 371 So.2d 1146

---

[5] Smith testified that Dr. Mauterer treated her mother for degenerative arthritis in her knees.

14

(La.1979)) (wherein this court explained that, "a claimant's disability is presumed to have been caused by an accident, if before the accident the claimant was in good health but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves, provided that the medical evidence establishes a reasonable possibility of a causal connection between the accident and the disabling condition.")

Therefore, this assignment has no merit.

*Temporary Total Disability Benefits*

The Town asserts in brief that under La.R.S. 23:1221(1)(a), TTD benefits are to be paid at "sixty-six and two-thirds percent of wages during the period of such disability." Given Smith's average weekly wage of $294.00, the Town argues that 66 2/3% of this wage is $196.00 and that it paid Smith such amount. The Town suggests that when the workers' compensation judge determined that TTD benefits were owed in the amount of $196.98, she apparently multiplied the average weekly wage by .67 rather than by .666666666 as it claims is required by statute. Therefore, the Town argues that the workers' compensation judge erred in finding that TTD benefits were paid at the incorrect rate and that Smith was owed an additional ninety-eight cents for each week that TTD benefits were paid.

Conversely, "[i]t is the position of [Smith] that she should have been paid $196.98 per week, or $294 x .67 (which is 66 2/3 percent, rounded to the nearest hundredth), under La.R.S. 23:1221(1)(a) for TTD [benefits]."

Louisiana Revised Statutes 23:1221 provides in pertinent part:

Compensation shall be paid under this Chapter in accordance with the following schedule of payments:

(1) Temporary total.

(a) For any injury producing temporary total disability of an employee to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured, and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability.

The issue posed in this appeal is whether the compensation rate should be calculated by multiplying the average weekly wage by 67% or by 66 2/3%. However, a plain reading of the statute clearly and specifically conveys that TTD benefits are to be paid at 66 2/3% of the average weekly wage during the period of disability. *See* La.R.S. 1:3.[6] To require the calculation imposed by the workers' compensation judge would be to essentially disregard the "sixty-six and two-thirds" provision of positive law in favor of "sixty-seven" percent.[7] Therefore, we conclude that the workers' compensation judge erred in finding that TTD benefits were paid at an incorrect rate and in ordering the Town to pay Smith an additional ninety-eight cents for each week that TTD benefits were paid.

*Supplemental Earnings Benefits*

In this assignment of error, the Town alleges that the workers' compensation judge erred in awarding SEBs because two physicians have released Smith to full duty. Furthermore, according to the Town, Smith "has failed to submit any pay stubs to the insurer within thirty (30) days of the termination of the week which is being claimed."

---

[6] Louisiana Revised Statutes 1:3 provides: "Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the language."

[7] We note that in the workers' compensation judge's reasons for ruling, she does not specifically state that she is multiplying Smith's average weekly wage by .67. Rather she states that, "the Workers' Compensation Statute requires the payment of sixty-six and two-thirds percent of the injured workers' average weekly wage; not sixty-six and two-thirds percent minus ninety-eight cents ($.98)." However, mathematical calculations demonstrate that multiplying the average weekly wage by 66 2/3%, as is required by the statute, results in the sum of $196.00, not $196.98.

Louisiana Revised Statutes 23:1221(3) provides in pertinent part:

(a) For injury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at time of injury, supplemental earnings benefits equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed by multiplying his "wages" by fifty-two and then dividing the quotient by twelve.

(b) For purposes of Subparagraph (3)(a), of this Paragraph, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sums actually received by the employee, including, but not limited to, earnings from odd-lot employment, sheltered employment, and employment while working in any pain.

(c)(i) Notwithstanding the provisions of Subparagraph (b) of this Paragraph, for purposes of Subparagraph (a) of this Paragraph, if the employee is not engaged in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the employee's or employer's community or reasonable geographic region.

Louisiana Revised Statutes 23:1221(3)(f) states: "Any compensable supplemental earnings benefits loss shall be reported by the employee to the insurer or self-insured employer within thirty days after the termination of the week for which such loss is claimed."

When awarding SEBs, the workers' compensation judge explained:

On November 27th, 2004, she began employment with Bill's Dollar Store. She earned a salary of five dollars fifty cent[s] ($5.50) per hour

according to her trial testimony. She ended employment with Bill's Dollar Store due to the discomfort of her knee. Her ending salary was six dollars ($6) per hour. There is no dispute that [Smith] was paid an average weekly wage at the time of her injury of two hundred ninety-four dollars ($294.00) per week. Her salary at Bill's Dollar Store does not amount to ninety percent of her pre-injury wage. Therefore, [Smith] is entitled to supplemental earnings benefits based upon her actual earnings from November 27th, 2004 through the end of her employment with Bill's Dollar Store. Supplemental earnings benefits shall continue based upon zero earnings from her last day of employment with Bill's Dollar Store through May 8th, 2005. On May 8th, 2005, [Smith] began employment with Columbia State School. Her starting salary was six dollars sixty-three cent[s] ($6.63) per hour. She currently earns six dollars seventy-six cent[s] ($6.76) per hour. During her employment period [Smith] is entitled to supplemental earnings benefits for any period wherein she did not earn ninety percent of her pre-injury wage.

At the outset, we note that Dr. Texada, Smith's treating orthopedic surgeon, did not release Smith to full duty. Rather the record shows that as of June 14, 2004, Dr. Texada's last appointment with Smith, he was still of the opinion that she was incapable of working. Moreover, as we have already concluded, the workers' compensation judge did not err in giving more weight to Dr. Texada's opinion that Smith could not work. *See Freeland*, 950 So.2d 100.

At trial, Smith testified that when she worked for the Town, she was paid $7.35 per hour and that she worked forty hours per week. She further testified that after her accident, she tried to return to her prvious position. However, she stated that the mayor informed her that "without surgery [she] couldn't return to work and that his insurance company wouldn't cover [her]." Smith testified that she found employment with Bill's Dollar Store in November 2004. According to Smith, she earned $5.50 an hour, and her duties included "running the cash register and stocking and doing some lifting. Just things you do in a store. But I didn't stay there because of all the standing -- was bad on my knee and the lifting."

18

She testified that she subsequently began working at Columbia Developmental Center as a residual service support employee. Her duties consisted of assisting two women "with their needs, which is not much. I just do a lot of sitting." Smith explained that when she first began working there, she was paid $6.63 an hour and that she worked full-time (40 hours per week). At the time of trial, she was earning $6.76 per hour.

After reviewing the record, we find that it supports a determination that when Smith worked at Bill's Dollar Store, she did not earn ninety percent of her pre-injury wages. Therefore, she is entitled to SEBs for the period she was employed by Bill's Dollar Store and the period thereafter in which she was unemployed. With regard to her employment at Columbia Developmental Center, Smith testified that her starting salary was $6.63 per hour and that she worked forty hours per week. When her average monthly wages are calculated, they are greater than ninety percent of her pre-injury wages.[8] Accordingly, we find that the workers' compensation judge erred in awarding SEBs for the period in which Smith worked at Columbia Developmental Center.

*Penalties*

According to the Town, Smith is not entitled to penalties because "all of her requests for medical care and indemnity are not related to employment." Alternatively, it argues that Smith's requests "were reasonably controverted based on the medical records and reports of D[octors] Brown and Fairbanks."

---

[8] Pursuant to La.R.S. 23:1221(3), Smith must show that her post-injury wages were less than ninety percent of her pre-injury wages. Smith's average monthly wages at the time of her injury were $1,274.00. Given her starting salary at Columbia Developmental Center, Smith's average monthly wages were $1,149.20, slightly greater than ninety percent of her pre-injury wages.

Pursuant to La.R.S. 23:1201(E), "[m]edical benefits . . . shall be paid within sixty days after the employer or insurer receives written notice thereof." Louisiana Revised Statutes 23:1201(F) provides in pertinent part:

> F. Failure to provide payment in accordance with this Section or failure to consent to the employee's request to select a treating physician or change physicians when such consent is required by R.S. 23:1121 shall result in the assessment of a penalty in an amount up to the greater of twelve percent of any unpaid compensation or medical benefits, or fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid or such consent is withheld, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. The maximum amount of penalties which may be imposed at a hearing on the merits regardless of the number of penalties which might be imposed under this Section is eight thousand dollars. An award of penalties and attorney fees at any hearing on the merits shall be res judicata as to any and all claims for which penalties may be imposed under this Section which precedes the date of the hearing. Penalties shall be assessed in the following manner:
>
> . . . .
>
> (2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.

The sanctions of La.R.S. 23:1201(F) also apply for the failure to timely authorize necessary medical treatment or procedures within sixty days. *Lambert v. Brookshire Grocery Co.*, 06-1001 (La.App. 3 Cir. 12/2/06), 945 So.2d 918.

In *Landry v. Furniture Center*, 05-634, p. 10 (La.App. 3 Cir. 1/11/06), 920 So.2d 304, 311, *writ denied*, 06-358 (La. 4/28/06) (citations omitted), this court explained:

> To avoid the imposition of penalties and attorney fees, the employer and its insurer must provide factual and medical evidence to reasonably controvert a workers' compensation claim. The employer must have an "articulable and objective reason to deny benefits at the time it took the action."

Unless manifestly erroneous, the awarding of penalties and attorney fees will not be overturned on appeal. *Id.*

In assessing various penalties, the workers' compensation judge remarked:

> Arbitrary and capricious behavior consists of wilful and unreasonable action without consideration and regard for the facts and circumstances presented or of seemingly unfounded motivation. The facts known to the employer/insurer at the time of its action helps determine whether the behavior complained of is arbitrary and capricious. Crucial to the inquiry is whether the employer had objective reasons for denying or discounting benefits at the time it took action. No representative of the Town of Olla testified at trial. Only an employee of the self-insured fund in which the [T]own participates, Ronald Reibe, testified at trial. Mr. Reibe testified and he is the person with ultimate authority to determine whether payments should be made on the claim. He is, in fact, the person who filed the Louisiana Department of Labor disputed claim for compensation form 1008 in this case against Elaine Smith. No witness was brought to explain any of the other determinations on this case after Mr. Reibe claimed he ended his hands-on activities on the claim. Mr. Reibe claimed a lack of knowledge in response to most questions under examination by counsel for Ms. Smith in spite of the fact that he had the payment authority and knew well in advance of trial that he was subpoenaed to appear at trial. He is a supervisor on the claim and yet did not bring an informed witness to defend this claim. Therefore, [the Town] did in fact fail to reasonably controvert [Smith's] claim for reinstatement of benefits, surgery, continued medical treatment, mileage reimbursement and vocational rehabilitation services. They were clearly arbitrary and capricious in their denial of her request for reinstatement of workers' compensation benefits and the payment of medical expenses. Therefore, for these reasons, the penalties as noted hereinabove are assessed and attorney fees are awarded in this case in the amount of ten thousand dollars ($10,000). All interest on all claims shall be paid in accordance with law.

Given the number of penalties, we will address them separately.

Termination of TTD Benefits

The Town contends that Smith "was not injured in the course and scope of her employment, and that any condition she does suffer from is caused by other factors, such as her weight." It argues that it reasonably controverted her claim based on the

21

testimonies of Dr. Brown and Dr. Fairbanks that Smith's injury was not caused by a work-related accident.

In assessing a penalty for the termination of TTD benefits, the workers' compensation judge noted:

> [The Town] was also arbitrary and capricious in their termination of temporary total disability benefits. [The Town] terminated [Smith's] workers' compensation benefits on May 14th, 2004 [sic]. They contend benefits were terminated because [Smith] refused their "IME for tie breaker." They also contend [Smith] abandoned medical treatment. Evidence demonstrates the alleged "tie breaker" was actually [the Town's] second choice of physician in the field of orthopaedics, and [Smith] was continuing to seek treatment with her choice of orthopaedic physician but said request was denied. [Smith's] failure to attend a medical examination with [the Town's] second choice of physician did not provide a basis for the termination of her temporary total disability benefits. Also, [Smith] did not abandon medical treatment. According to the testimony of Dr. Texada, any lapse between treatment periods for [Smith] were due to [the Town's] failure to authorize said treatments. Furthermore, at the time of the termination of benefits, the only doctor finding [Smith] able to return to work was Dr. Douglas Brown. He found she was able to return to work as of January 23rd, 2004. However, she was released from work again by her treating physician, Dr. Texada, on June 14th, 2004.
>
> Jurisprudence has held that an employer/insurer may not avoid penalties for arbitrary nonpayment by relying on an initial optimistic medical report if they receive substantial evidence to indicate the employee has a continuing disability. Further, this Court notes the termination of benefits on May 12th, 2004. However, defendant's exhibit twelve shows the correspondence requesting the appointment with the "tie breaker" is dated May 13th, 2004. Benefits were terminated prior to a request for [Smith] to be examined by a second choice of physician. Therefore, her failure to attend said examination could not serve as the reason for said termination of benefits.

The record shows that Reibe wrote a letter to Smith dated May 13, 2004, stating that TTD benefits were paid through May 12, 2004. He explained: "You have not supplied us with any additional medicals to substan[t]iate your continued disability status therefore we are withholding any further indemnity payments until your status can be determined." Reibe further explained that because of Dr. Brown's

22

opinion that Smith could return to work, she was scheduled for "a third opinion to help you, your employer, and RMI determine your status for continued benefits."

We note that on January 6, 2004, Dr. Texada opined that Smith was unable to return to work and that surgery was needed. Following his examination of Smith on January 23, 2004, Dr. Brown opined that Smith's injury was not work-related, that she could return to work, and that surgery was not necessary. The Town did not have Dr. Fairbanks' opinion indicating the same findings because Dr. Fairbanks did not examine Smith until months after TTD benefits were terminated.

Additionally, we note that when Smith returned to Dr. Texada on May 27, 2004, he noted her persistent problems with her knee, that she had not been able to return to work, and that he felt that her injury was work-related. We further note that in a June 8, 2004 letter Reibe sent to Dr. Texada, he stated:

> We would appreciate you briefly commenting on Ms. Smith's ability to return to work under the conditions noted by Dr. Brown, specifically since her January 6th visit to your office and in light of your May 27th evaluation indicating she is disabled until her June 16th [sic] appointment.

While there is no indication in the record what response, if any, Dr. Texada provided to Reibe regarding Smith's disability, it shows that after her June 17, 2004 appointment, Dr. Texada restricted her from returning to work.

In *Harris v. Langston Co., Inc.*, 94-1266 (La.App. 3 Cir. 4/5/95), 653 So.2d 789, *writ denied*, 95-1178 (La. 6/23/95), 656 So.2d 1020, the employer discontinued the claimant's benefits based on the opinion of its choice of physician that the claimant could return to work. When the benefits were terminated, there was no indication in the record that her treating physician had released her to return to work. This court did "not find this information sufficient to terminate benefits or that

Langston made a reasonable effort to determine Ms. Harris' exact medical condition at the time of termination." *Id*. at 797. Thus, this court held that the claimant's right to benefits was not reasonably controverted.

Here, Dr. Texada restricted Smith from working. Approximately two weeks later, Dr. Brown evaluated her and opined that she could work. At the time of termination, the Town stated that because of Dr. Brown's opinion, a third opinion was needed to "determine [Smith's] status for continued benefits." We note that Smith was not examined by Dr. Fairbanks until October 5, 2004. Insofar as Smith's disability status was not certain at the time of termination, we find that the workers' compensation judge's determination that the Town did not reasonably controvert Smith's claim for TTD benefits is supported by the record. Therefore, we conclude that the workers' compensation judge's imposition of penalties was not manifestly erroneous.

This assignment has no merit.

Failure to Pay TTD Benefits at the Correct Rate

As previously mentioned, the Town argues that the workers' compensation judge erred in awarding a penalty for its alleged failure to pay TTD benefits at the correct rate.

The workers' compensation judge explained her reasons for imposing this penalty:

> [Smith] was paid temporary total disability benefits at the rate of one hundred ninety-six dollars ($196) per week. Louisiana Revised Statute[s] 23:1221(1)(a) requires benefits to be paid at the rate of sixty-six and two-thirds percent of the average weekly wage. Sixty-six and two-thirds percent of [Smith's] average weekly wage of two hundred and ninety-four dollars ($294) amounts to one hundred ninety-six dollars ninety-eight cent[s] ($196.98) per week. [Smith] is owed ninety-eight cent[s] for each week that benefits were incorrectly paid. Ronald

Reibe, adjuster for Risk Management, was questioned about the discrepancy in payments. He testified no one "checked out the discrepancy in the comp rate." He blames the failure to do so on the work load and thousands of claims handled by their office. [The Town] referred to the discrepancy as a "minor and contrived argument." It has been considered "not substantial enough." This court disagrees. . . . [T]he Workers' Compensation Statute requires the payment of sixty-six and two-thirds percent of the injured workers' average weekly wage; not sixty-six and two-thirds percent minus ninety-eight cents ($.98). This Court finds [the Town] to have been arbitrary and capricious in their failure to correct the discrepancy in [Smith's] compensation rate. [Smith's] request for the adjustment to her compensation rate was ignored and thus her claim for same was not reasonably controverted. A penalty of two thousand dollars ($2000) is assessed against [the Town] for their failure to correct the discrepancy in [Smith's] compensation rate.

Because we have determined that the workers' compensation judge erred in calculating the amount of TTD benefits that were owed by the Town, we find that the imposition of a penalty is clearly wrong.

Mileage Reimbursement and Vocational Rehabilitation

The Town appeals the $2,000.00 penalty awarded for Smith's mileage reimbursement and vocational rehabilitation claims.

Louisiana Revised Statutes 23:1203 provides:

D. In addition, the employer shall be liable for the actual expenses reasonably and necessarily incurred by the employee for mileage reasonably and necessarily traveled by the employee in order to obtain the medical services, medicines, and prosthetic devices, which the employer is required to furnish under this Section, and for the vocational rehabilitation-related mileage traveled by the employee at the direction of the employer. When the employee uses his own vehicle, he shall be reimbursed at the same rate per mile as established by the state of Louisiana for reimbursement of state employees for use of their personal vehicle on state business. The office shall inform the employee of his right to reimbursement for mileage.

In addressing Smith's mileage reimbursement claim, the workers' compensation judge remarked:

Mileage expenses incurred by [Smith] while seeking medical treatment were not reimbursed. [The Town] fail[ed] to present evidence to explain and/or justify their refusal to reimburse mileage expenses incurred by [Smith]. All mileage expenses incurred by [Smith], as a result of her receipt of medical treatment for the injury received on October 16th, 2003, shall be reimbursed.

At trial, Reibe testified that Smith's requests for mileage reimbursement "were probably not paid in lieu of the fact that when those were submitted there was still the opinion that this was not a compensable claim based on the information learned from the doctors at that time." However, when presented with the fact that the physicians Smith was traveling to see had been paid, Reibe testified that he did not know why her mileage expenses were not paid. Accordingly, the record supports the workers' compensation judge's determination that Town did not reasonably controvert this claim with regard to mileage.

With regard to Smith's claim for vocational rehabilitation, the workers' compensation judge stated:

Louisiana Revised Statute[s] 23:1226 requires the employer to provide prompt vocational rehabilitation services to return a disabled worker to work when they are unable to earn wages equal to their pre-injury wages. No vocational rehabilitation was provided by [the Town.] The Town of Olla recognized through its August 24th, 2004 correspondence from its mayor, that no positions were available that could accommodate [Smith.] Still no vocational rehabilitation services were offered. Due to [the Town's] failure to reimburse [Smith] for mileage expenses and their failure to provide vocational rehabilitation services, a penalty of two thousand dollars ($2000) is assessed against [the Town.]

Counsel for Smith introduced into evidence a letter written by the mayor that was addressed to Reibe. The mayor wrote: "All of the jobs, in the departments she was hired to work, and in which we have openings would require getting in and out of vehicles, lifting and bending; manual labor type jobs. Regretfully, due to her limitations, I do not feel there are any positions available in which we could

26

reasonably accommodate Ms. Smith." At trial, Reibe testified that Smith was never provided with vocational rehabilitation and that no explanation was given as to why. Because it was shown that Smith could not return to work with the Town in any capacity and that vocational rehabilitation was never offered pursuant to La.R.S. 23:1226, we find that the record supports the workers' compensation judge's conclusion that this claim was not reasonably controverted.

This assignment has no merit in that the penalty awarded for the Town's failure to pay Smith's mileage reimbursement and to provide her with vocational rehabilitation was not manifestly erroneous.

Follow-up Visits and Medical Expenses

The Town argues that the workers' compensation judge erroneously assessed it with a penalty for its failure to authorize Smith's follow-up visits with Dr. Texada and for its failure to pay an x-ray bill associated with Smith's examination with a court-appointed independent medical examiner.

In her reasons for ruling, the workers' compensation judge stated:

An additional penalty of two thousand dollars ($2000) is assessed against [the Town] for their refusal to authorize follow-up visits with [Smith's] treating physician. Said penalty is also being assessed due to [the Town's] failure to pay medical expenses incurred as a result of [Smith's] examination by the court appointed independent medical examiner, Dr. Brent Bankston. All outstanding medical expenses incurred as a result of medical treatment received by [Smith], due to her October 16th, 2003 injury, shall be paid by [the Town].

Smith testified that on August 31, 2004, she had an appointment with Dr. Texada but was not able to see him. She explained:

Well, I got there and signed in and everything. I sat there for about two hours in the -- in the front, and they finally called me to the back for about another hour. And then, they came and told me that they [were] waiting to hear from Dr. Fairbanks and they wouldn't even see me -- after I had sat there all that time.

According to Smith, on October 12, 2004, she called for an appointment and was informed that Dr. Texada's office was waiting on Dr. Fairbanks to make his decision. Furthermore, she tried to schedule another appointment in July 2005, and was told "that workman's [sic] comp would no longer pay for it."

According to Reibe, he did not know that Dr. Texada testified that he did not see Smith for a period of time because her appointments were not authorized. Reibe could not "say one way or the other" whether those visits were authorized. Given the circumstances, we find that the record supports the workers' compensation judge's determination that Smith was unfairly denied access to her treating physician.

The record shows that Smith was examined by a court-appointed physician, Dr. A. Brent Bankston[9] in the summer of 2005 and that there was a bill for x-rays in the amount of $180.00. On November 4, 2005, counsel for the Town sent correspondence to Smith informing her that payment for the bill was due. Yet, on November 9, 2005, another letter was sent to Smith stating that the previous letter "was mailed in error." The record suggests that the bill had not been paid; however, Reibe confirmed that other charges associated with this exam had been paid.

The Town argues, in brief, that at the time of trial, "the bill for $180.00 had been put into queue for payment, although this was not introduced into evidence during the hearing." It, therefore, contends that because sixty days had not lapsed between the time the Town was sent notification of the bill and the date of trial, a penalty should not have been awarded.

---

[9] We note that in his report, Dr. Bankston opined that surgery would not likely be beneficial for Smith's problems but that "arthroscopic evaluation of the knee is an option to rule out any other pathology."

In *Dubois v. Louisiana Forest Industries Inc.*, 98-895, p. 11 (La.App. 3 Cir. 12/9/98), 722 So.2d 409, 415, *writ denied*, 99-49 (La. 2/26/99), 738 So.2d 586, this court held that "as a matter of law, an employer cannot urge its own poor clerical work or administrative lapses to escape penalties for nonpayment." Here, the Town cannot successfully argue that it should not have to pay penalties because it made a mistake in initially denying payment for the x-ray bill and forwarding it to Smith. Further, there is no indication in the record exactly when the bill was sent to the Town and if the bill had in fact, as the Town asserts, been put into queue for payment.

Based on the above evidence, we conclude that the penalty imposed by the workers' compensation judge for the failure to authorize follow-up visits with Dr. Texada and for the failure to pay Dr. Bankston's x-ray bill was not manifestly erroneous.

This assignment is without merit.

*Attorney Fees*

The Town argues that attorney fees should not have been awarded.

In *Lambert*, 945 So.2d at 933, this court stated:

> Louisiana Revised Statutes 23:1201(F) allows an award of attorney's fees when the employer fails to timely pay medical expenses and/or authorize treatment. Although there is no limitation on the amount of attorney's fees which may be awarded, the award must be reasonable, and it will not be overturned absent manifest error. *Alexander [v. Autozone, Inc.*, 04-871 (La.App. 3 Cir. 12/8/04),] 889 So.2d 366. The reasonableness of an award of attorney's fees is determined from "the degree of skill and ability exercised, the amount of the claim, and the amount recovered for the plaintiff, and the amount of time devoted to the case." *Id*. at 378 (quoting *Semere v. Our Lady of Lourdes Hosp.*, 03-1702, p. 14 (La.App. 3 Cir. 6/29/04), 875 So.2d 1048, 1057.)

Here, the record is clear that the Town failed to timely pay medical expenses and authorize treatment. Therefore, attorney fees were properly awarded.

29

Considering the expansive medical evidence, the complexities of this case, and a favorable outcome for Smith, we find that the workers' compensation judge did not abuse her discretion in awarding $10,000.00 in attorney fees. *See Jackson v. Christus Health Cent. La.*, 05-983, p. 17 (La.App. 3 Cir. 2/1/06), 922 So.2d 748, 759 (quoting *Lemelle v. Wal-Mart Stores, Inc.*, 04-527, p. 13 (La.App. 3 Cir. 9/29/04), 883 So.2d 526, 534) (wherein this court stated that the "amount of the statutory attorney fees rests within the discretion of the WCJ [workers' compensation judge], provided the amount is supported by the record.") Accordingly, this assignment has no merit.

Smith answered the appeal seeking additional attorney fees for work performed on appeal. We award $2,500.00 for work performed on this appeal.

## DECREE

For the foregoing reasons, we amend the award for SEBs to include only the period in which Smith worked at Bill's Dollar Store and any period thereafter where she was unemployed. Further, we reverse the workers' compensation judge's ruling that the Town owed Smith an additional ninety-eight cents for each week that TTD benefits were paid; accordingly, we also reverse the penalty imposed as to that award. In all other respects, the ruling of the workers' compensation judge is affirmed. Additional attorney fees for work performed on appeal in the amount of $2,500.00 are awarded to Smith. Costs of this appeal are divided equally between Elaine Smith and the Town of Olla. Pursuant to La.R.S. 13:5112,[10] we set forth the total cost of this appeal as $1,012.00.

**AFFIRMED AS AMENDED; REVERSED IN PART. ADDITIONAL ATTORNEY FEES AWARDED FOR WORK PERFORMED ON APPEAL.**

---

[10] Louisiana Revised Statutes 13:5112(A) requires that court costs assessed against the state or any political subdivision thereof be expressed as a dollar amount in a trial court judgment or appellate court decree.